252 P.3d 382 (2011)
CITY OF FEDERAL WAY, a Washington municipal corporation, Respondent,
v.
TOWN & COUNTRY REAL ESTATE, LLC, a Washington limited liability corporation; Frank A. Scarsella, taxpayer; Emil P. Scarsella, taxpayer; and the City of Tacoma, a Washington municipal corporation, Appellants.
No. 39407-3-II.
Court of Appeals of Washington, Division 2.
April 5, 2011.
As Corrected May 10, 2011.
*385 Richard R. Wilson, Hillis Clark Martin & Peterson PS, Seattle, WA, for Appellant.
Bob C. Sterbank, Kenyon Disend PLLC, Issaquah, WA, Peter Bruce Beckwith, City of Federal Way, Federal Way, WA, Duncan Mcgehee Greene, Jay Palmer Derr, GordonDerr LLP, Seattle, WA, for Respondents.
Grant David Wiens, Dionne & Rorick LLP, Seattle, WA, amicus counsel for Washington State Assoc. of Municipalities.
HUNT, J.
¶ 1 Town & Country Real Estate, LLC, Frank A. Scarsella, and Emil P. Scarsella (collectively "Town & Country") appeal the superior court's reversal of the City of Tacoma's hearing examiner's decision striking a State Environmental Policy Act (SEPA)[1] traffic impact mitigation payment from Tacoma's conditional approval of a proposed residential development. Town & Country argues that (1) we must give special deference to the hearing examiner's legal conclusions; (2) RCW 82.02.020's definition of "direct impact" does not encompass the traffic effects that the proposed development will generate; (3) the mitigation payment is not "reasonably necessary" under RCW 82.02.020; (4) the mitigation payment is not based on a "specific" environmental impact as SEPA requires;[2] and (5) the mitigation payment is not "reasonable and capable of being accomplished" under SEPA.[3]
¶ 2 Despite Town and Country's having appealed the superior court's order reversing the hearing examiner's decision, Federal Way bears the burden on appeal to show the invalidity of the hearing examiner's decision.[4] Federal Way argues that the hearing examiner: (1) lacked jurisdiction to consider Tacoma's "statutory authority or jurisdiction," Br. of Appellant (Federal Way) at 26, to require the mitigation payment; (2) applied the wrong standard of review; (3) made at least one erroneous finding of fact; (4) erred in concluding that RCW 82.02.020 requires "`nexus'" and "`rough proportionality,'" Br. of Appellant (Federal Way) at 33 (quoting Clerk's Papers (CP) at 44) analyses; (5) erred by concluding that RCW 82.02.020 barred Tacoma from seeking the mitigation payment because (a) the road improvement projects had been planned before Town & Country proposed its development, and (b) Federal Way intends to construct these improvement projects regardless of whether Town & Country completes its proposed development; (6) erroneously concluded that the number of trips the proposed development would generate was "insignificant," Br. of Appellant (Federal Way) at 47, under SEPA; and (7) erred by applying the Growth Management Act (GMA)[5] to this case. Tacoma echoes some of Federal Way's arguments. Tacoma also argues that some of its hearing examiner's findings of fact are actually legal conclusions or applications of law to the facts.
¶ 3 Holding that Tacoma's mitigation payment was lawful under RCW 82.02.020 and SEPA, we affirm most of the superior court's decision, reverse the hearing examiner's striking of the mitigation payment condition from Tacoma's approval of the Scarsella plat, and reinstate Tacoma's imposition of the mitigation payment.

FACTS
¶ 4 Town & Country owns 9.22 acres within the City of Tacoma's jurisdictional boundaries; *386 part of this land abuts Federal Way. Town & Country sought Tacoma's approval of its "Scarsella Preliminary Plat," proposal to subdivide its 9.22 acres into 51 single-family residential lots. Administrative Record (AR) at 345. Town & Country retained Hans Korve of DMP Engineering to act as its representative and project manager for the Scarsella plat.

I. Application Process
¶ 5 On December 18, 2006, Korve submitted to the city of Tacoma Town & Country's application for approval of the Scarsella plat, with the required environmental checklist.[6] As part of its "typical process" for reviewing such an application, Report of Proceedings (RP) (June 19, 2008) at 19, Tacoma forwarded, in a memorandum dated March 2, 2007, Town & Country's application and checklist to "All Concerned Agencies and Departments," AR at 773, for their review and comments. Federal Way was among the recipients.

A. Adverse Transportation Impact Projects
¶ 6 In a March 16, 2007 letter to Tacoma, Federal Way: (1) expressed concerns "about adverse transportation impacts to existing and future City of Federal Way streets and intersections resulting from the [Scarsella plat]"; (2) requested that "a traffic impact analysis be required"; and (3) advised that the environmental checklist "must be revised to identify impacted City of Federal Way roadways, and identify mitigation of significant adverse transportation impacts."[7] AR at 360. Tacoma forwarded Federal Way's comments to Korve.
¶ 7 Shortly thereafter, Korve contacted Richard Perez, a Federal Way traffic engineer. Perez suggested that Korve use Federal Way's "concurrency analysis"[8] to study the Scarsella plat's potential traffic effects. RP (July 11, 2008) at 176. Following Perez's suggestion, Korve provided Federal Way with a "Concurrency Application." AR at 1244. After Korve submitted the "Concurrency Application," Federal Way conducted an independent study of the Scarsella plat dated October 11, 2007 and titled "Transportation Concurrency Analysis." AR at 1149.
¶ 8 Federal Way's "Transportation Concurrency Analysis" addressed four factors to consider in determining how a proposed development would affect the city's roadways: (1) the number of trips the proposed development would generate; (2) the directions the trips would take ("trip distribution"); (3) the mode of transportation of each trip (carpool, transit, individual driving, etc.); and (4) the route each trip would take ("transit assignment").[9] RP (July 11, 2008) at 140-41. This analysis then focused on a point within the following six years ("horizon year")[10] to determine whether Federal Way would have the "capacity to absorb" the traffic that a proposed development would generate at that point. RP (July 11, 2008) at 210. If Federal Way would not have the capacity to absorb the projected traffic from the proposed development, then a "level of service failure" (LOSF) would occur.[11] RP (July 11, 2008) at 274.
*387 ¶ 9 A "transportation improvement plan" (TIP) is necessary to mitigate a LOSF. RP (July 11, 2008) at 209. Adopting Perez's and other administrative hearing witnesses' language, we similarly refer to construction projects or repair works intended to mitigate current or future traffic conditions as "TIPs." See, e.g., RP (July 11, 2008) at 180-81. Federal Way's October 11, 2007 Transportation Concurrency Analysis concluded that the Scarsella plat would generate at least one new trip at each of 22 different Federal Way locations already scheduled to undergo TIPs. The study recommended that Town & Country "pay [a] pro-rata share contribution towards these projects in the amount of $439,282."[12] AR at 1149.
¶ 10 Federal Way conducted a second study dated October 29, 2007. One significant difference between the first and second studies was that the first study included all TIPs affected by one Scarsella plat-generated trip or more; the second study included only TIPs affected by a "10-trip threshold." RP (July 11, 2008) at 180. Using this latter standard, the October 29, 2007 study determined that the Scarsella plat's expected traffic would impact only four locations already scheduled to undergo a TIP. This second study recommended that Town & Country "voluntarily contribute $266,344 in pro-rata share contributions." AR at 413. On November 5, 2007, Federal Way sent a letter asking Tacoma to "impose traffic mitigation in the amount of $266,344" on Town & Country as a condition of approval of the Scarsella plat. AR at 292. Federal Way later revised its requested amount of traffic mitigation to $250,123.[13]
¶ 11 In December 2007, Korve asked licensed traffic engineer and traffic engineering expert Christopher Brown to evaluate Federal Way's October 29, 2007 study. Brown wrote a letter to Korve expressing "grave doubts" about Federal Way's calculations of how many trips the Scarsella plat would generate and the distribution of these trips. AR at 666. Brown also submitted his own "Traffic Assignment Analysis," dated February 25, 2008, AR at 672, which concluded that "[n]o traffic mitigation fees to Federal Way streets are justified." AR at 683.

B. Mitigated Determination of Non-Significance
¶ 12 On April 9, 2008, Tacoma issued a Mitigated Determination of Nonsignificance (MDNS) under its SEPA authority. Tacoma approved the Scarsella plat on condition that Town & Country either "construct[s] all TIP projects impacted by ten or more vehicular trips or voluntarily contribute $266,344 to the City of Federal Way in pro-rata share contributions."[14] AR at 264. We refer to this condition as the "mitigation payment."
*388 ¶ 13 In an April 21, 2008 letter to the Tacoma Public Works Department, Korve declared Town & Country's intent to appeal the mitigation payment condition of Tacoma's approval of the Scarsella plat. Korve also asserted that Tacoma had failed to comply with various provisions of the Tacoma Municipal Code. Korve's assertions included slightly different versions of the arguments that Town & Country now raises on appeal: That the mitigation payment that was not "reasonable and capable of being accomplished" under SEPA and had "no clear nexus" between the traffic the Scarsella plat would generate and the TIP locations. AR at 706 (emphasis omitted).

I. Tacoma Hearing Examiner
¶ 14 A hearing was held before a Tacoma hearing examiner on May 1, 2008. Although the record contains no transcripts from this May 1 hearing, it appears that the following occurred: (1) The hearing examiner granted Federal Way's unopposed motion to intervene in Town & Country's appeal; (2) the parties advised the hearing examiner that they wanted a continuance until June 19; and (3) the hearing examiner posed questions to the parties and as a result, on May 28, the parties stipulated that the hearing examiner had jurisdiction to hear Town & Country's application for preliminary plat approval and to consider the propriety of Tacoma's condition of plat approval that Town & Country make the required traffic impact mitigation payment to Federal Way.

A. Hearing
¶ 15 Town & Country submitted a "Prehearing Brief" to the hearing examiner, arguing that (1) the mitigation payment was not "reasonable and capable of being accomplished" and, therefore, in violation of SEPA, AR at 234; (2) the mitigation payment required Town & Country "to mitigate far more than the actual impacts of the Scarsella plat traffic" because it did not accurately measure "the specific traffic assignment and distribution" of the Scarsella plat traffic, AR at 236 (emphasis omitted); and (3) the mitigation payment violated the RCW 82.02.020 requirement that it be "reasonably necessary as a direct result" of the Scarsella plat. AR at 237 (emphasis omitted). In its memorandum to the hearing examiner, Tacoma argued that the mitigation payment complied with SEPA's requirement that the payment be "proportionate to the impact of the proposed development." AR at 248-49.
¶ 16 The hearings took place on June 19 and July 11, 2008. Brown and Korve testified on June 19. Brown criticized Federal Way's October 29, 2007 "Transportation Concurrency Analysis" study, RP (June 19, 2008) at 44, and elaborated on the details of his own February 25, 2008 report. On July 11, Federal Way traffic engineers Natarajan Janardhanan and Richard Perez testified about Federal Way's "Transportation Currency Analysis" and Brown's "Traffic Assignment Analysis."
¶ 17 Tacoma filed a post-hearing memorandum, arguing that the two days of hearings established that the mitigation payment satisfied the "nexus" and "rough proportionality" conditions of RCW 82.02.020, AR at 175, and was compliant with SEPA's requirement that it be "reasonable and capable of being accomplished." AR at 182. Federal Way incorporated Tacoma's SEPA arguments by reference into its post-hearing memorandum.[15] In its post-hearing memorandum, Town & Country argued that the mitigation payment was invalid under SEPA because the dollar amount was "manifestly unreasonable," AR at 160, and because Tacoma had failed to show that it was related to "specific, adverse environmental impacts clearly identified in an environmental document on the proposal." AR at 154 (quoting WAC 197-11-660(1)(b)). Town & Country also advanced the argument now before us on appealthat RCW 82.02.020 does not authorize a local government to impose mitigation payments *389 on private landowners if the environmental impact is "cumulative," as opposed to "direct." AR at 161 ("[U]nder RCW 82.02.020... cumulative impacts are not direct impacts.")

B. Decision
¶ 18 On September 5, 2008, the hearing examiner issued his Findings of Fact, Conclusions of Law, and Decisions, paraphrased as follows:
Findings of Fact
(1) Town & Country failed to demonstrate that the methodology that Federal Way uses to predict the effect of traffic that the Scarsella plat would generate "has not been developed in accordance with accepted transportation modeling practices or has been improperly utilized by Federal Way in its analysis of Town & Country's subdivision proposal." Clerk's Papers (CP) at 29 (Finding of Fact (FF) 13).
(2) Federal Way's "methodology and calculations of trip distribution" were "consistent with accepted transportation princip[les]." CP at 30 (FF 14).
(3) "[T]he need for [the two TIPs] ... are not a direct result of the traffic expected to be contributed by Town & Country's proposed subdivision." CP at 31 (FF 16).
(4) "Federal Way did not actually determine the specific impact of the [Scarsella plat]." CP at 32 (FF 18).
Conclusions of Law
(1) SEPA not only permitted, but also required, Tacoma to "mitigate the extra-territorial impacts of development in Tacoma on neighboring jurisdictions." CP at 41 (Conclusion of Law (CL) 13).
(2) Federal Way's traffic analysis did not suffer from the same defects as the traffic analysis that Division One of this court found inadequate in previous similar cases.[16] CP at 43 (CL 16).
(3) The mitigation payment fell short of the requirements of RCW 82.02.020 because "Federal Way ... failed to establish that" the payment was "reasonably necessary to mitigate the direct impact of [the Scarsella plat]." CP at 43 (CL 16).
(4) The mitigation payment did not survive scrutiny under SEPA because it did not satisfy SEPA's condition that the mitigation payment "mitigate specific environmental impacts which are identified in environmental documents prepared under [SEPA]." CP at 43 (CL 16 (quoting RCW 43.21C.060)).
(5) Tacoma was not authorized to impose the mitigation payment because both TIPs for which Tacoma sought mitigation payment "have been planned for some time by Federal Way and well before Town & Country's subdivision was proposed," and "Federal Way plans to proceed with the TIPs regardless of whether Town & Country proceeds with the development of its proposed subdivision." CP at 43-44 (CL 16).
(6) The mitigation payment did not satisfy RCW 82.02.020's requirement of "rough proportionality" because "it d[id] not take into account the fact that these TIPs are required whether or not Town & Country's subdivision is developed." CP at 44 (CL 17).
(7) "Federal Way has not identified the specific impact to these street facilities resulting from Town & Country's proposed subdivision, as it has not done a `with the project' and 'without the project' analysis." CP at 45 (CL 17).
(8) "[T]he percentage of trips using the identified intersection and arterial corridor from Town & Country's plat, is insignificant." CP at 45 (CL 17).
(9) The mitigation payment "does not comport with the nexus requirements of RCW 82.02.020, 58.17.100 ['State Subdivision Act'], and 43.21C.060 [SEPA]." CP at 45 (CL 18).
¶ 19 Accordingly, the hearing examiner struck the mitigation payment condition from Tacoma's approval of the Scarsella plat.

*390 C. Motions for Reconsideration
¶ 20 Although Town & Country moved for reconsideration of an issue related to water drainage, it did not challenge the accuracy of Federal Way's October 29, 2007 traffic study. Tacoma also moved for reconsideration, arguing that the following facts did not necessarily mean that the mitigation payment violated RCW 82.02.020:(1) Federal Way had planned the TIPs before Town & Country filed the Scarsella plat application; (2) Federal Way failed to include "with the project" and "without the project" analyses, AR at 67 (quoting Ex. 19.4 at 2); (3) the percentages of trips that the Scarsella plat would generate by the two locations were very low; and (4) SEPA authorizes mitigation payments even if the need for TIPs arises from multiple causes and, thus, the hearing examiner erred in concluding that Tacoma's required mitigation payment violated SEPA.
¶ 21 In its motion for reconsideration, Federal Way argued that the hearing examiner had applied the wrong standard of review to the mitigation payment that Tacoma required and improperly used the "nexus" and "rough proportionality" standards in his RCW 82.02.020 analysis. AR at 82. The remainder of Federal Way's argument mirrored Tacoma's arguments.
¶ 22 The hearing examiner amended the language of some of the Conclusions of Law and granted in part some of the motions for reconsideration. But he did not change the substance of his decision in any way that affects the issues before us on appeal.

III. Superior Court Review
¶ 23 On November 24, 2008, in Pierce County Superior Court, Federal Way filed a Land Use Petition Act (LUPA)[17] petition for review of the hearing examiner's decisions (except for the hearing examiner's determinations concerning the water drainage issue). Tacoma "aligned" itself with Federal Way in its Notice of Appearance filed with the superior court. CP at 278. The superior court reversed the hearing examiner and reinstated the mitigation payment as follows:
(1) The hearing examiner's findings of fact were unchallenged and accepted as verities on appeal, except for the hearing examiner's Findings of Fact 16 and 18.[18] CP at 405 (CL 1).
(2) The mitigation payment complies with SEPA because it is for "specific, adverse traffic impacts that the Scarsella plat [will] impose on" the locations requiring TIPs and those "adverse traffic impacts were identified in environmental documents." CP at 405 (CL 2).
(3) Substantial evidence does not support the hearing examiner's Finding of Fact 18 that Federal Way "did not actually determine the specific impact of the proposed subdivision alone" because Federal Way "did not develop information on the two TIPs for 2009 horizon year 'without the project.'" CP at 406 (CL 3 (quoting Hearing Examiner's Findings of Fact, Conclusions of Law, and Decisions)); see CP at 32.
(4) The hearing examiner's Conclusion of Law 16 that Federal Way failed to show that the mitigation payment was a "direct impact" of the traffic expected to be generated by the Scarsella plat is "an erroneous interpretation of the law and/or a clearly erroneous application of the law to the facts," and, "for the same reasons," the last sentence of the hearing examiner's Finding of Fact 16 also is erroneous. CP at 406-07 (CL 4).
(5) The hearing examiner's Conclusion of Law 16, that the mitigation payment violated RCW 82.02.020 because both TIPs had been planned before to the Scarsella plat proposal and because Federal Way *391 plans to proceed with the development of the TIPs regardless of whether the Scarsella plat is built, is also "an erroneous interpretation to the law and/or a clearly erroneous application of the law to the facts." CP at 407 (CL 4).
(6) The mitigation payment complies with the RCW 82.02.020 requirement that it be "reasonably necessary to mitigate the direct impact of a proposed development." CP at 407 (CL 5).
(7) The hearing examiner erred by applying RCW 82.02.090 because that provision applies only to "impact fees" levied under the GMA. CP at 408 (CL 6).
(8) The "proportional relationship" between the mitigation payment and the anticipated traffic generated by the Scarsella plat is "reasonable." CP at 409 (CL 7).
(9) The percentage of trips that the Scarsella project will generate using the two TIP locations "is a significant impact for SEPA purposes." CP at 410 (CL 8).
(10) "[T]here is no case law holding that requiring mitigation for the extent of a proposed development's contribution to cumulative, significant impacts violates either SEPA or RCW 82.02.020." CP at 410 (CL 9).
(11) The hearing examiner's Conclusion of Law 18, which states that "[t]he mitigation payment does not comport with the nexus requirements of RCW 82.02.020, 58.17.100 [the State Subdivision Act], and 43.21C.060 [SEPA]," CP at 45, is "an erroneous interpretation of the law and a clearly erroneous application of the law to the facts."[19] CP at 411 (CL 10).[20]

IV. Court of Appeals Review
¶ 24 Town & Country filed a notice of appeal of the superior court's reversal of the hearing examiner's decision. But under our General Order 2010-1, "the party filing an appeal in superior court under ... LUPA shall have responsibility for the opening and reply briefs before our court, and shall be entitled to open and conclude oral argument." General Order 2010-1 of Division II, In Re: Modified Procedures For Appeals Under The Administrative Procedures Act, Chapter 34.05, and Appeals Under the Land Use Petition Act, Chapter 36.70C RCW (Wash.Ct.App.), available at http://www. courts.wa.gov/appellate_trial_courts/; see also Clallam County v. W. Wash. Growth Mgmt. Hearings Bd., 130 Wash.App. 127, 133, 121 P.3d 764 (2005), review denied, 163 Wash.2d 1053, 187 P.3d 751 (2008). Therefore, we treat Federal Way (and Tacoma, whose interests are "aligned" with Federal Way, CP at 278) as the appellants here because they are the parties who challenged the hearing examiner's decision in the superior court and now in our court; and, as in the superior court, it is they who bear the burden of showing that the hearing examiner erred.

ANALYSIS
¶ 25 In its LUPA petition to the superior court, Federal Way, with which Tacoma "aligned," CP at 278, alleged that the hearing examiner's decision entitled them to relief under RCW 36.70C.130(1)(b), (c), and (d). Our review of the hearing examiner's decision is therefore limited to those grounds, namely that the traffic mitigation payment condition of approval of Town & Country's application violated RCW 82.02.020 and SEPA. Federal Way, Tacoma, and Town & Country disagree about the level of deference that we must give to the hearing examiner's legal conclusions. Federal Way also argues that the hearing examiner made at least one erroneous finding of fact, applied the wrong standard of review, lacked jurisdiction to consider certain arguments, and erred by applying the GMA to this case.

I. Standard of Review

A. LUPA
¶ 26 When reviewing a superior court's decision under LUPA, we stand in the shoes of the superior court, reviewing the *392 ruling below on the administrative record. HJS Dev., Inc. v. Pierce County ex. rel. Dep't of Planning & Land Servs., 148 Wash.2d 451, 468, 61 P.3d 1141 (2003) (quoting Citizens to Preserve Pioneer Park LLC v. City of Mercer Island, 106 Wash.App. 461, 470, 24 P.3d 1079 (2001)). The party that filed the LUPA petition in the superior court, here, Federal Way and Tacoma, has the burden of meeting one of the six standards under RCW 36.70C.130(1):[21]
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
¶ 27 Challenges under subsection (b) are legal questions that we review de novo, Quality Rock Prods., Inc. v. Thurston County, 139 Wash.App. 125, 133, 159 P.3d 1 (2007), review denied, 163 Wash.2d 1018, 180 P.3d 1292 (2008), but only "after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise." RCW 36.70C.130(1)(b). Challenges under subsection (c) are factual questions, which we will uphold if there is "substantial evidence" to support the factual finding or "evidence that would persuade a fair-minded person of the truth of the statement asserted." Cingular Wireless, LLC v. Thurston County, 131 Wash.App. 756, 768, 129 P.3d 300 (2006). Challenges brought under subsection (d) involve applying the law to the facts, which we review under the "clearly erroneous" standard"whether we are left with a definite and firm conviction that a mistake has been committed." Cingular Wireless, 131 Wash. App. at 768, 129 P.3d 300.

B. No Deference to Hearing Examiner's Legal Conclusions
¶ 28 Federal Way and Tacoma contend that (1) the hearing examiner is entitled to deference under RCW 36.70C.130(1)(b) only when he interprets Tacoma city ordinances; and (2) because the hearing examiner allegedly applied state law (specifically, various SEPA statutes and administrative rules and RCW 82.02.020), rather than Tacoma city ordinances, we should not confer any deference on the hearing examiner's legal conclusions. See Br. of Appellant (Federal Way) at 26-27; Br. of Appellant (Tacoma) at 9-10. Town & Country responds that deference under RCW 36.70C.130(1)(b) may be given to the hearing examiner's conclusions even when he interprets state law. See Br. of Resp't (Town & Country) at 21, n. 58. We agree with Federal Way and Tacoma.
¶ 29 Town & Country cites Lanzce G. Douglass, Inc. v. City of Spokane Valley, 154 Wash.App. 408, 225 P.3d 448, review denied, 169 Wash.2d 1014, 236 P.3d 895 (2010). The only language in that case arguably supporting Town & Country's position is: "And we must give substantial deference to both the legal and factual determinations of a hearing examiner as the local authority with expertise in land use regulations." Douglass, 154 Wash.App. at 415, 225 P.3d 448 (citing City of Medina v. T-Mobile USA, Inc., 123 Wash. App. 19, 24, 95 P.3d 377 (2004)). This language, however, does not directly support Town & Country's claim that we should accord deference to the hearing examiner's legal conclusions based on SEPA. Town & Country also attempts to construe "land use regulations" to mean all land use regulations, including state regulations such as SEPA. *393 But a plain reading of the Douglass court's reference to the "expertise" possessed by the "local authority" shows that this language is intended to mean "expertise" in "local ... land use regulations." Douglass, 154 Wash. App. at 415, 225 P.3d 448 (emphasis added).
¶ 30 We hold, therefore, that the hearing examiner's legal conclusions in this case are not entitled to any deference under RCW 36.70C.130(1)(b) because they involve interpretations of state law, rather than Tacoma city ordinances. Accordingly, we review the hearing examiner's legal conclusions de novo, without any special deference. Quality Rock, 139 Wash.App. at 133, 159 P.3d 1.

II. Hearing Examiner's Jurisdiction
¶ 31 Federal Way argues that the hearing examiner lacked jurisdiction to consider the "statutory authority or jurisdiction of [Tacoma] to issue [the SEPA traffic mitigation payment]" because Town & Country failed to list these challenges in the "Grounds of the Appeal," AR at 705, section of their "SEPA appeal" it filed with the hearing examiner. Br. of Appellant (Federal Way) at 27. Town & Country counters that the hearing examiner could consider these challenges because Town & Country had listed them in its prehearing memorandum. We agree with Town & Country.
¶ 32 The legality of the SEPA traffic mitigation payment that Tacoma requires of Town & Country is the central issue on appeal. Town & Country raised this essential issue in its appeal to the hearing examiner[22] in its prehearing[23] and post-hearing memoranda.[24] And, as the hearing examiner noted, "The parties engaged in much discussion regarding Tacoma's authority to impose conditions to mitigate impacts associated with the new development." CP at 41 (CL 14).
¶ 33 In our view, Town & Country challenged the general legality of the mitigation payment throughout the course of the administrative proceeding below, sufficiently to present to the hearing examiner the specific issue of the "statutory authority or jurisdiction of [Tacoma] to issue [the SEPA traffic mitigation payment]." Br. of Appellant (Federal Way) at 27. We hold, therefore, that the hearing examiner had jurisdiction to rule on the question of Tacoma's statutory authority or jurisdiction to prescribe the mitigation payment.

III. Hearing Examiner's Standard of Review
¶ 34 Federal Way next contends that the hearing examiner (1) erred by applying the standard of review found in TMC 13.12.680(4)(e)(ii) ("outside the statutory authority") to his review of the SEPA traffic mitigation payment that Tacoma ordered Town & Country to pay when Tacoma issued its MDNS, Br. of Appellant (Federal Way) at 26 (quoting CP at 40, CL 12); and (2) should have employed instead the standard found in TMC 13.12.680(4)(e)(iv) ("clearly erroneous"). Br. of Appellant (Federal Way) at 26. Town & Country counters that the hearing examiner used the proper standard. Reviewing de novo this question of law, we agree with Federal Way.
¶ 35 TMC 13.12.680(4)(e) provides:
Standards of Review. The Hearing Examiner may affirm the decision of the responsible official ... or the Examiner may reverse the decision if the administrative findings, inferences, conclusions, or decisions are:
(ii) ... outside the statutory authority or jurisdiction of the City; or
...

*394 (iv) [i]n regard to challenges to the appropriateness of the issuance of a DNS[,] clearly erroneous in view of the public policy of the Act (SEPA).
(Emphasis added).
¶ 36 Here, Tacoma included Town & Country's traffic mitigation payment as part of its MDNS. SEPA administrative rules define an "MDNS" as "a DNS [Determination of Nonsignificance] that includes mitigation measures." WAC 197-11-766. When Town & Country appealed Tacoma's issuance of the MDNS, it was contesting a particular type of DNS, namely a "mitigated" DNS. By its express language, TMC 13.12.680(4)(e)(iv) applies to "challenges to the appropriateness of the issuance of a DNS"; under that code subsection, the correct standard of review for the hearing examiner to have applied was whether the mitigation payment condition of the MDNS was "clearly erroneous in view of the public policy of [SEPA]." TMC 13.12.680(4)(e)(iv). Accordingly, we hold that the hearing examiner erred as a matter of law in applying the wrong standard of review under TMC 13.12.680(4)(e)(ii).

IV. Hearing Examiner's Findings of Fact 16 and 18
¶ 37 Tacoma contends that parts of the hearing examiner's Findings of Fact 16 and 18 are actually legal conclusions that we should address under RCW 36.70C.130(1)(b) or, in the alternative, as mixed questions of fact and law under RCW 36.70C.130(1)(c). We agree that parts of Findings of Fact 16 and 18 are mixed questions of law and fact. "In an appeal of an administrative decision involving a mixed question of law and fact, [we do] not try the facts de novo but ... determine[ ] the law independently of the agency's decision and appl[y] it to facts as found by the agency." Renton Educ. Ass'n v. Pub. Emp't Relations Comm'n, 101 Wash.2d 435, 441, 680 P.2d 40 (1984).

A. Finding of Fact 16
¶ 38 The hearing examiner's Finding of Fact 16 states:
Testimony by Federal Way's Traffic Engineer Perez established that the TIPs for the improvements of the 21st Avenue SW/336th Street intersection and the SW 336th Street/340th Street to 26th Place SW and Hoyt Road corridor have been planned for some time by Federal Way due to the expected LOS failure; that the reduction in service level to LOS F would occur with or without Town & Country's proposed subdivision; and Federal Way, if funding became available, would proceed with both TIPs even if the proposed subdivision was not developed. Thus, the evidence establish[ed] that the need for improvements planned for the 21st Avenue SW/336th Street intersection and the 336th Street/340th Street to 26th Place SW and Hoyt Road arterial corridor are not a direct result of the traffic expected to be contributed by Town & Country's proposed subdivision.

CP at 31 (CL 16) (emphasis added) (footnote omitted).
¶ 39 Our italicization of part of Finding of Fact 16 above denotes an application of the law to the facts.[25] "Analytically, resolving a mixed question of law and fact requires establishing the relevant facts, determining the applicable law, and then applying that law to the facts." Erwin v. Cotter Health Ctrs., 161 Wash.2d 676, 687, 167 P.3d 1112 (2007) (quoting Tapper v. State Emp't Sec. Dep't, 122 Wash.2d 397, 403, 858 P.2d 494 (1993)). Under RCW 36.70C.130(1)(d), we review questions of mixed law and fact under the "clearly erroneous" standard. See Cingular Wireless, 131 Wash.App. at 768, 129 P.3d 300. The "clearly erroneous" standard asks "whether we are left with a definite and firm conviction that a mistake has been committed." Id. As discussed infra Analysis Part V.B., this application of law to facts was clearly erroneous.

*395 B. Finding of Fact 18
¶ 40 The hearing examiner's Finding of Fact 18 states:
Federal Way, in its analysis of the traffic distribution of peak hour vehicle trips expected to be generated by Town & Country's proposed subdivision, did not develop information on the two TIPs for 2009 horizon year "without the project." Thus, Federal Way did not actually determine the specific impact of the proposed subdivision alone since it is "lumped" into all trips expected to be using the two street facilities at the 2009 horizon year.

CP at 32 (FF 18) (emphasis added). Our analysis of the above italicized portion of Finding of Fact 18[26] is very similar to that for Finding of Fact 16 because both are mixed questions of law and facts, which we review under the "clearly erroneous" standard. As we discuss infra, Analysis Part IV.B., the hearing examiner's application of law to facts here was clearly erroneous.
¶ 41 Turning to the above non-italicized portion of Finding of Fact 18, Federal Way and Tacoma contend that the hearing examiner erroneously found that Federal Way "did not develop information on the two TIPs for the 2009 horizon year `without the project'." Br. of Appellant (Tacoma) at 25 (quotation omitted); see also Br. of Appellant (Federal Way) at 34. They urge us to affirm the superior court's reversal of the hearing examiner on this ground. Town & Country counters that the hearing examiner accurately characterized Federal Way's traffic analysis and, therefore, we should affirm the hearing examiner. We agree with Town & Country.
¶ 42 We review the first sentence of Finding of Fact 18 under the "substantial evidence" standard to determine whether the record contains "evidence that would persuade a fair-minded person of the truth of the statement asserted." Cingular Wireless, 131 Wash.App. at 768, 129 P.3d 300. Federal Way's October 29, 2007 study presented data on (1) then current traffic conditions at the two locations without completion of the Scarsella plat and with completion of the TIPs; see AR at 376, 409; and (2) horizon year (2009) traffic conditions at the two locations with completion of the Scarsella plat and with completion of the TIPs; see AR at 376. The printouts that Federal Way submitted as exhibits at the July 11, 2008 hearing presented data on (1) 2009 forecasted conditions at the two locations without completion of the Scarsella plat and without completion of the TIPs; see AR at 1260, 1262; and (2) horizon year (2009) traffic conditions at the two locations with completion of the Scarsella plat and without completion of the TIPs. See AR at 1264, 1266; RP (July 11, 2008) at 259-61.
¶ 43 Federal Way did not present any data on the 2009 traffic conditions at the two locations without completion of the Scarsella plat and without completion of the TIPs. This absence of data is sufficient to "persuade a fair-minded person" the truth of the statement that "Federal Way, in its analysis of the traffic distribution of peak hour vehicle trips expected to be generated by Town & Country's proposed subdivision, did not develop information on the two TIPs for 2009 horizon year `without the project'." CP at 32. Accordingly, we reverse the superior court's reversal of the hearing examiner on this ground and reinstate the first sentence of the hearing examiner's Finding of Fact 18.

V. Mitigation Under RCW 82.02.020

A. "Nexus" and "Rough Proportionality" Tests
¶ 44 Federal Way next argues that the hearing examiner erred in concluding that RCW 82.02.020 requires a "`nexus'" and "`rough proportionality.'" Br. of Appellant (Federal Way) at 33 (quoting CP at 44-45). Town & Country counters that the "rough proportionality" analysis applies to RCW 82.02.020, but Town & Country does not address whether RCW 82.02.020 also contains the "nexus" element. Br. of Resp't (Town & *396 Country) at 44. This is a question of law, which we review de novo.
¶ 45 The "nexus" and "rough proportionality" tests are also called the "Nollan/Dolan" tests, after the United States Supreme Court's decisions in Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). The Nollan majority held that the United States Constitution's Fifth Amendment "takings clause" requires an "essential nexus" between the negative impacts that a private property use generates and the conditions or prohibitions imposed to restrict that use of private property. Nollan, 483 U.S. at 837, 107 S.Ct. 3141. Seven years later, the United States Supreme Court announced in Dolan that the "takings clause" contains a "rough proportionality" test requiring the government to "make some sort of individualized determination that the required dedication [of private land] is related both in nature and extent to the impact of the proposed development." Dolan, 512 U.S. at 391, 114 S.Ct. 2309.
¶ 46 Our Supreme Court has applied the Dolan "rough proportionality" test when analyzing the legality of a mitigation payment under RCW 82.02.020. See Trimen Dev. Co. v. King County, 124 Wash.2d 261, 274, 877 P.2d 187 (1994) (citing Dolan, 512 U.S. 374, 114 S.Ct. 2309). Our Supreme Court has also drawn a distinction between applying "the Nollan-Dolan standard" to "fees in lieu of possessory exactions" and applying this standard to "GMA impact fees," appearing to have approved of the latter, but disapproved of the former. See City of Olympia v. Drebick, 156 Wash.2d 289, 301-03, 126 P.3d 802 (2006). Thus, in our state, the Nollan/Dolan analysis applies to mitigation payments under RCW 82.02.020.
¶ 47 We agree with the hearing examiner and Town & Country that RCW 82.02.020 contains the same kind of "rough proportionality" analysis embodied in the Nollan/Dolan standard, regardless of whether the exacted condition of approval is a mitigation payment or dedication of land. Br. of Resp't (Town & Country) at 44-45. But we disagree with the hearing examiner's conclusion that Tacoma's mitigation payment violated RCW 82.02.020 because Tacoma "d[id] not take into account the fact that these TIPs are required whether or not Town & Country's subdivision is developed." CP at 44. As we explain infra, Analysis Part V.D., our Supreme Court has held that a mitigation payment may be lawful under RCW 82.02.020 even if the payment mitigates a condition that existed before the new development. See Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wash.2d 740, 760, 49 P.3d 867 (2002).
¶ 48 Accordingly, we hold that (1) the hearing examiner did not err in ruling that RCW 82.02.020 contains a proportionality analysis similar to the Nollan/Dolan standard, but (2) the hearing examiner erred in concluding that the mitigation payment violated this standard.

B. "Direct Impact"
¶ 49 Federal Way argues that the "direct impact" and "direct result" language in RCW 82.02.020 encompass the effects of the traffic that the Scarsella plat would generate on the horizon year level-of-service failures (LOSFs). Town & Country maintains that "direct impact" and "direct result" do not include these effects.[27] This is a question of applying the law to the facts, which we review under the "clearly erroneous" standard. We agree with Federal Way.
¶ 50 Town & Country argues that, if the LOSFs will not occur without the expected Scarsella plat traffic, then the project's traffic would have only a "cumulative impact" on the levels of service. Br. of Resp't (Town & Country) at 37. Town & Country correctly claims that Federal Way has failed to prove that the LOSFs will not occur but-for the Scarsella plat traffic. In the proceedings below, Federal Way showed only that the LOSFs will occur during the horizon year if Town & Country builds out the Scarsella plat and Federal Way does not construct the *397 TIPs. See AR at 1264; 1266. But Federal Way failed to eliminate the possibility that the LOSFs will occur in the horizon year even if the TIPs are not constructed and Town & Country does not build the Scarsella plat. In other words, Federal Way established that, without the TIP road improvements, the intersections will fail if Town & Country builds the Scarsella plat. See AR at 1264; 1266. But Federal Way did not show that the intersections will or will not fail without road improvements even if Town & Country does not build the Scarsella plat.
¶ 51 Based on this correct assessment of what Federal Way did and did not establish during the proceedings below, Town & Country asserts that if the horizon-year LOSFs will occur regardless of whether Town & Country builds the Scarsella plat, then the traffic that the Scarsella plat will generate cannot have a "direct impact" on the LOSs. Br. of Resp't (Town & Country) at 30 ("Federal Way thus never demonstrated that any direct traffic impact of the Scarsella plat will necessitate the two TIP project improvements.")
¶ 52 Town & Country's argument hinges on RCW 82.02.020's definition of "direct," which Town & Country interprets to mean a necessary condition; put differently, the Scarsella plat-generated traffic will have a "direct impact" on the LOSFs only if the Scarsella-plat-generated traffic is a necessary component of the LOSFs. But the ordinary meaning of "direct"[28] is not equivalent to the definition of a "necessary condition."[29] That the horizon-year LOSFs would occur in the absence of the Scarsella-plat-generated traffic does not preclude the Scarsella plat traffic's having an impact that "proceed[s] from one point to another in ... space without deviation or interruption" on the LOSFs.[30] Thus, Town & Country's interpretation of "direct impact" under RCW 82.02.020 fails.

C. "Cumulative Impacts"
¶ 53 Town & Country also attempts to persuade us that "direct impact" under RCW 82.02.020 precludes "cumulative impacts." Br. of Resp't (Town & Country) at 38. Town & Country argues that the Scarsella plat traffic will have, at best, a "cumulative impact" on the LOSFs; Town & Country then claims that RCW 82.02.020 forbids the imposition of mitigation payments for such "cumulative impacts." Br. of Resp't (Town & Country) at 41. Town & Country then concludes that Tacoma's mitigation payment violates RCW 82.02.020 for this reason. This argument fails.
¶ 54 In support of its position, Town & Country encourages us to read the SEPA Rules, ch. 197-11 WAC "in pari materia"[31] with RCW 82.02.020. WAC 197-11-792(2)(c) provides three categories of "impacts" that an environmental impact statement must contain: (i) "[d]irect"; (ii) "[i]ndirect"; or (iii) "[c]umulative." Town & Country asserts that the existence of these three implies that a "direct impact" under RCW 82.02.020 cannot be both a "cumulative impact" and a "direct impact." This argument fails.
¶ 55 First, WAC 197-11-792(2)(c) is not a statute. The Department of Ecology promulgated it; the legislature did not enact it. Because the purpose of reading multiple statutes together is to divine the "legislative purpose" behind them, this doctrine is less relevant to reading a legislative enactment and an agency rule together. Beach v. Bd. of Adjustment of Snohomish Cnty., 73 Wash.2d 343, 346, 438 P.2d 617 (1968) (emphasis added) (citing Buell v. McGee, 9 Wash.2d 84, 113 P.2d 522 (1941); White v. City of North Yakima, 87 Wash. 191, 151 P. 645 (1915)).
¶ 56 Second, RCW 82.02.020 and WAC 197-11-792 differ in terminology and organization; *398 and these differences weigh against juxtaposing language from one provision with the other.[32] RCW 82.02.020 uses "direct" to modify both "impact" and "result"; WAC 197-11-792 does not use the word "result." The legislature did not organize RCW 82.02.020, which contains only one numbered list, into sections and sub-sections. In contrast, Ecology organized WAC 197-11-792 into three tiers of sections and subsections. The relatively unrestrained format of RCW 82.02.020, compared to the rigid configuration and differing vocabulary of WAC 197-11-792, weighs against assigning the same meaning to the word "direct" even though the word appears in both provisions.
¶ 57 Third, and most importantly, superimposing WAC 197-11-792 on RCW 82.02.020 would frustrate the purpose of SEPA to ensure that "`environmental amenities and values be given appropriate consideration in [government] decision[making].'" Anderson v. Pierce County, 86 Wash.App. 290, 300, 936 P.2d 432 (1997) (quoting Stempel v. Dep't of Water Res., 82 Wash.2d 109, 118, 508 P.2d 166 (1973)). As Town & Country concedes, the SEPA rules provide that local governments may include "direct" and "cumulative" impacts when considering the environmental effects of a particular private land use. Br. of Resp't (Town & Country) at 40; see WAC 197-11-792(2)(c). SEPA also grants local governments authority to condition or to deny private land use based on the land's direct and cumulative impacts. See WAC 197-11-660. Town & Country's argument, however, implies that RCW 82.02.020 constrains this authority by limiting mitigation payment requirements to direct impacts. If the legislature enacted RCW 82.02.020 to deny local governments authority to impose mitigation payments that accommodate cumulative impacts, why would Ecology bother to promulgate SEPA rules that permit local governments to consider these same cumulative impacts?[33]
¶ 58 Alternatively, Town & Country apparently argues that if RCW 82.02.020 permits mitigation payments for cumulative impacts, then these cumulative impacts "properly include only the effects of pending and future proposals, not the impacts of an applicant's proposal coupled with those of any past actions." Br. of Resp't (Town & Country) at 41. Town & Country concludes that Tacoma's imposition of the SEPA traffic mitigation payment violates RCW 82.02.020 because the traffic that the Scarsella plat would generate would have a "direct impact" only if Tacoma combined that anticipated increase in traffic with estimated increases in traffic that other projected population growth would generate. Our Supreme Court has held that a mitigation payment was lawful even though the payment alleviated, in part, a then presently existing condition. See Trimen, 124 *399 Wash.2d at 274, 877 P.2d 187.[34] Accordingly, Town & Country's alternative argument fails.
¶ 59 Town & Country fails to persuade us that we should read WAC 197-11-792 together with RCW 82.02.020 to discern the meaning of "direct impact" in RCW 82.02.020. Town & Country has also failed to advance any other persuasive argument for precluding the effect of the Scarsella plat traffic on the LOSFs from the definition of "direct impact" under RCW 82.02.020.[35] Accordingly, we reverse this portion of the hearing examiner's decision on this ground.

D. "Previously Planned"
¶ 60 Federal Way and Tacoma further argue that the hearing examiner erroneously interpreted RCW 82.02.020 by concluding that Federal Way could not seek contributions for TIPs that Federal Way had planned before Town & Country proposed the Scarsella plat because Federal Way intends to construct the TIPs regardless of whether Town & Country builds the Scarsella plat. Federal Way and Tacoma do not dispute these findings of fact, but they claim that RCW 82.02.020 permits the imposition of mitigation measures when such facts are present.[36] Reviewing this application of law to the facts under the "clearly erroneous" standard, we agree with Federal Way and Tacoma.
¶ 61 The hearing examiner concluded that the SEPA traffic mitigation payment violated RCW 82.02.020 because: (1) "[b]oth TIPs to which Federal Way is seeking contributions... have been planned for some time ... and well before Town & Country's subdivision was proposed"; and (2) "Federal Way plans to proceed with the TIPs regardless of whether Town & Country proceeds with the development of its proposed subdivision." CP at 43-44. Our Supreme Court has held otherwise. See, e.g., Isla Verde, 146 Wash.2d at 760-61, 49 P.3d 867 (noting that in Trimen, a mitigation payment was properly imposed on a developer for contributing to a preexisting deficiency in the number of park acres, a deficiency that had been identified in a report predating the developer's application for subdivision approval). Accordingly, we reverse the hearing examiner's decision on this ground.

E. "Reasonably Necessary"
¶ 62 Town & Country next argues that the mitigation payment is not "reasonably necessary" under RCW 82.02.020 to mitigate the LOSFs. Town & Country does not provide any authority to support its interpretation of "reasonably necessary." Br. of Resp't (Town & Country) at 43. Instead, it asserts an incorrect premisethat there is no "direct impact" under RCW 82.02.020 in this caseand infers from this erroneous premise that the mitigation payment is not *400 "reasonably necessary." Br. of Resp't (Town & Country) at 43. Federal Way counters that the mitigation payment is "reasonably necessary" because it requires Town & Country to pay only a percentage of the TIPs' costs.[37] Again, this is a question of applying of the law to the facts, which we review under the "clearly erroneous" standard. We agree with Federal Way.
¶ 63 The methodology that Federal Way used to calculate the mitigation payment in this case is consistent with holdings in previous cases. In Castle Homes and Dev., Inc. v. City of Brier, 76 Wash.App. 95, 882 P.2d 1172 (1994), Division One of our court suggested that the City of Brier should have used the same methodology that Federal Way used here. See Castle Homes, 76 Wash. App. at 108, 882 P.2d 1172. Our Supreme Court has also held that local governments can satisfy the "reasonably necessary" element of RCW 82.02.020 through "the statistical probability of additional park use by each unit of new residential development." Drebick, 156 Wash.2d at 317, 126 P.3d 802 (citing Trimen, 124 Wash.2d 261, 877 P.2d 187). Thus, we hold that Federal Way determined the mitigation payment in this case in a manner sufficient to comply with the reasoning in Trimen and Castle Homes and, thus, was "reasonably necessary" under RCW 82.02.020. Insofar as it concluded otherwise, the hearing examiner's decision was a clearly erroneous application of law to the facts. We reverse the hearing examiner's decision on this ground.

VI. SEPA
¶ 64 SEPA requires that "environmental amenities and values be given appropriate consideration in [government] decision[making]." Anderson, 86 Wash.App. at 300, 936 P.2d 432 (quoting Stempel, 82 Wash.2d at 118, 508 P.2d 166). Additionally, the "Environmental Code" of the Tacoma Municipal Code is "intend[ed] ... to govern compliance by all City departments/divisions, commissions, boards, committees, and City Council with the procedural requirements of [SEPA itself]." TMC 13.12.020(3)
¶ 65 SEPA also requires that, before granting any proposal, local governments must make a "`threshold determination'" of whether the proposal is a "`major action significantly affecting the quality of the environment.'" Moss v. City of Bellingham, 109 Wash.App. 6, 15, 31 P.3d 703 (2001) (quoting RCW 43.21C.030(2)(c)). The "responsible official" of the "lead agency" reviewing the proposal makes the "threshold determination."[38]Moss, 109 Wash.App. at 15, 31 P.3d 703 (quoting WAC 197-11-310(1), (2)). As it did here, the agency considers, among other things, an environmental checklist that the applicant prepares. Id. (citing WAC 197-11-315).
¶ 66 Under SEPA, after evaluating the appropriate materials, the lead agency issues a determination of significance (DS), a determination of nonsignificance (DNS), or a mitigated determination of nonsignificance (MDNS). See Moss, 109 Wash.App. at 15, 31 P.3d 703 (citing WAC 197-11-310(5)(a), (b), 197-11-340, 197-11-350(3)). SEPA warrants a DS if "the responsible official determines that a proposal may have a probable significant adverse environmental impact." WAC 197-11-360(1). SEPA allows a DNS if "there will be no probable significant adverse environmental impacts from a proposal." WAC 197-11-340(1). And an MDNS is justified if: (1) "the lead agency indicates a DS is likely"; and (2) "the applicant ... clarif[ies] or change[s] features of the proposal to mitigate the impacts which led the agency to consider a DS likely." Following this, "[t]he lead agency shall make its threshold determination based upon the changed or clarified proposal." WAC 197-11-350(2).
¶ 67 Under TMC 13.12.350(7), "[m]itigation measures incorporated in the mitigated DNS shall be deemed conditions of approval of the permit, unless revised or changed by the decision maker. The conditions shall be enforced in the same manner as any term or *401 condition of the permit, or enforced in any manner specifically prescribed by the City."

A. "Significant Adverse Environmental Impact"
¶ 68 Federal Way disputes the hearing examiner's conclusion that the amount of Scarsella-plat-generated trips that would use the two intersections was "insignificant." CP at 45. This conclusion involves applying law to facts, which we review under the "clearly erroneous" standard. We agree with Federal Way.
¶ 69 Under SEPA rules, a local government may issue a DS only if the proposal is likely to have "a probable significant adverse environmental impact." WAC 197-11-360(1) (definition of DS). A local government may issue an MDNS only if the local government is likely also to issue a DS.[39] Thus, local governments may issue an MDNS (such Tacoma's MDNS conditioned on the traffic mitigation payment here) only if a proposal is likely to have a "probable significant adverse environmental impact." WAC 197-11-360(1).
¶ 70 The SEPA rules define the concept of significance. Under WAC 197-11-794,
(1) Significant as used in SEPA means a reasonable likelihood of more than a moderate adverse impact on environmental quality.
(2) Significance involves context and intensity (WAC 197-11-330) and does not lend itself to a formula or quantifiable test. The context may vary with the physical setting. Intensity depends on the magnitude and duration of an impact.
Under WAC 197-11-330(3)(c), "[s]everal marginal impacts when considered together may result in a significant adverse impact."
¶ 71 Town & Country argues that Scarsella-plat-generated traffic will be "insignificant" because Federal Way estimated that such traffic would contribute only 0.05% and 0.12% of the automobile trips that would use the two TIP locations in 2009. Br. of Resp't (Town & Country) at 49. But "significance" under SEPA is not limited to a "formula or quantifiable test." WAC 197-11-794(2). Rather, the dispositive factors are the "context and intensity." WAC 197-11-794(2). Based on these factors, the traffic that the Scarsella plat will generate, when taken in conjunction with projected population growth, would cause LOSFs at the two intersections and is, therefore, a significant adverse impact under the SEPA rules. See Tiffany Family Trust Corp. v. City of Kent, 155 Wash.2d 225, 232, 119 P.3d 325 (2005) ("One accepted formula for determining the amount of a mitigation fee is based on the increased peak hour trips a given development will generate in the relevant area."). Accordingly, we reverse the hearing examiner's decision on this ground.

B. "Identified"
¶ 72 Town & Country further argues that the mitigation payment also violates SEPA because the payment is not related to "specific adverse environmental impacts clearly identified in an environmental document on the proposal." Br. of Resp't (Town & Country) at 46 (quoting WAC 197-11-660(1)(b) (emphasis added)). Federal Way counters that it complied with this provision of the SEPA rules. Although the hearing examiner did not expressly address this issue, we agree with Federal Way.
¶ 73 Town & Country correctly claims that Federal Way failed to show whether the intersections would experience the LOSFs if neither the Scarsella plat nor the TIPs were constructed. From this, however, Town & Country erroneously concludes that Tacoma failed to show a "specific" impact under SEPA. This argument fails because Federal Way established that the Scarsella plat would generate an additional 27 to 32 trips for both TIP locations. Federal Way then demonstrated that these additional trips would contribute *402 to LOSFs at the two TIP locations if Federal Way did not construct the TIPs by the horizon year. This precise documentation shows a "specific adverse environmental impact[] clearly identified in an environmental document on the proposal."[40] WAC 197-11-660(1)(b).
¶ 74 Town & Country also contends that Tacoma failed to locate these specific impacts "in an environmental document on the proposal." Br. of Resp't (Town & Country) at 47 (quoting WAC 197-11-660(1)(b) (emphasis added)). Town & Country claims that Tacoma did not identify the 27 to 32 additional trips in its MDNS and that these additional trips came to light only as "last-minute data" presented during the hearing below. Br. of Resp't (Town & Country) at 48. As Federal Way correctly argues, however, SEPA requires only that the responsible official identify the impact, not prove the impact. Here, Federal Way's October 29, 2007 study identified the LOSFs that would be partially caused by the Scarsella plat. In its MDNS, Tacoma referred to this study and attached it as an exhibit. See AR at 263-64. Thus, we hold that Tacoma sufficiently satisfied SEPA's "identified" requirement.

C. "Reasonable and Capable of Being Accomplished"[41]
¶ 75 Town & Country argues that the mitigation payment is not "reasonable and capable of being accomplished" under SEPA rule WAC 197-11-660(1)(c). Town & Country attempts to subsume its other arguments under this heading, concluding that the mitigation payment is "excessive, immoderate, absurd, and extreme." Br. of Resp't (Town & Country) at 49. We disagree. On the contrary, the mitigation payment satisfies the requirements of RCW 82.02.020 and SEPA. We hold, therefore, that the mitigation payment is both "reasonable and capable of being accomplished" under the SEPA rules. WAC 197-11-660(1)(c).

VII. GMA
¶ 76 Federal Way argues that the hearing examiner erred by analyzing the MDNS under the GMA (RCW 82.02.090)[42] instead of under SEPA. This issue involves applying the law to the facts, which we review under the "clearly erroneous" standard. We agree with Federal Way.
¶ 77 As we have already discussed, RCW 82.02.020 does not actually grant state and local governments the authority to impose any exactions on private landowners where "`reasonably necessary as a direct result of the proposed development.'" Cobb v. Snohomish County, 64 Wash.App. 451, 462, 829 P.2d 169 (1991) (quoting RCW 82.02.020). Instead, RCW 82.02.020 merely affirms the government's authority to "enter into an agreement" with the private landowners to collect such exactions so long as they are not "indirect taxes, fees, or charges on development activity" except for "on-site dedications and easements which are permitted by other statutes." Cobb, 64 Wash.App. at 462, 829 P.2d 169 (emphasis added). Thus, the authority to impose the exaction must come from another source. SEPA is one such source. Drebick, 156 Wash.2d at 301, 126 P.3d 802.
¶ 78 The record indicates that Tacoma imposed the traffic mitigation payment condition of approval of the Scarsella plat under SEPA, not the GMA, which does not apply in this instance. We hold, therefore, that the hearing examiner erred by using the GMA (RCW 82.02.090) as a basis for vacating the mitigation payment condition; accordingly, we reverse the hearing examiner's conclusion of law number 17.

*403 VIII. Conclusion
¶ 79 We hold that the hearing examiner had jurisdiction to consider whether Tacoma had authority to require the traffic mitigation payment to Federal Way as a condition of Town & Country's Scarsella plat approval. Agreeing with and affirming most of the superior court's decision, we hold that Tacoma's mitigation payment was lawful under RCW 82.02.020 and SEPA. Therefore, we reverse the hearing examiner's striking of the traffic mitigation payment condition from Tacoma's approval of the Scarsella plat and reinstate Tacoma's imposition of the mitigation payment to Federal Way.
We concur: ARMSTRONG, P.J., and VAN DEREN, J.
NOTES
[1] Ch. 43.21C RCW; ch. 197-11 WAC.
[2] WAC 197-11-660(1)(b).
[3] WAC 197-11-660(1)(c).
[4] See General Order 2010-1 of Division II, In Re: Modified Procedures For Appeals Under The Administrative Procedures Act, Chapter 34.05, and Appeals Under the Land Use Petition Act, Chapter 36.70C RCW (Wash.Ct.App.), available at http:// www.courts.wa.gov/appellate_trial_courts/; see also Clallam County v. W. Wash. Growth Mgmt. Hearings Bd., 130 Wash.App. 127, 133, 121 P.3d 764 (2005), review denied, 163 Wash.2d 1053, 187 P.3d 751 (2008).
[5] Ch. 36.70A RCW.
[6] This environmental checklist is required under SEPA and its associated rules, chapter 197-11 WAC. Tacoma has explicitly adopted these administrative rules promulgated under SEPA, ch. 197-11 WAC. Tacoma Municipal Code (TMC) 13.12.004.
[7] Federal Way also expressed concerns about water drainage, which concerns, however, are not before us in this appeal.
[8] A "concurrency analysis" is a study to ensure that roads (and other public facilities and servicesat the time that proposed new development becomes occupied) are adequate to serve current or future development without decreasing service levels below locally established minimum standards. See http://www.wsdot.wa.gov/ planning/LandUse/concurrency_state-ownedsystem (last visited August 31, 2010); see also RP (July 11, 2008) at 221 (referencing the requirement of being "concurrent for purposes of GMA").
[9] Federal Way's model, which is similar to the models that local and federal governments use, takes into account information from census figures, Washington state employment data, and various surveys. Federal Way's model is peer reviewed and its accuracy is not disputed in this appeal.
[10] RP (July 11, 2008) at 183.
[11] A LOSF technically occurs at an un-signalized intersection if the volume/capacity ratio of the intersection is greater than 1.0; at a signalized intersection, a LOSF occurs if Federal Way has graded the level of service lower than level "E." See RP (July 11, 2010) at 210, 222.
[12] Federal Way calculated the amount of Town & Country's pro-rata contribution (1) using the above-described modeling process to determine the number of trips that the Scarsella plat will generate through each location, (2) calculating the total number of trips passing through each particular location from all sources, (3) dividing this total number of trips through the particular location by the number of trips that the Scarsella plat will generate to determine the applicable fraction, and (4) multiplying the cost of the particular TIP by this fraction. The resulting number is Town & Country's pro-rata contribution to the TIP.
[13] This revision eliminated two of the four TIP locations included in the October 29, 2007 study because they were anticipated to fail in 2014, rather than 2009 (2009 was the "horizon year," the year that Federal Way assumed Town & Country would finish constructing the Scarsella plat). RP (July 11, 2008) at 180-81.

The remaining TIP locations would (1) "[a]dd 2nd left-turn lanes all approaches, WB right-turn lane" at "21st Ave SW @ SW 336th St"; and (2) "[w]iden to 5 lanes" at "SW 336th Wy / SW 340th St: 26th Pl SWHoyt Rd." AR at 1246. Federal Way estimated that the Scarsella plat would generate 27 additional trips at the first TIP location and 27 to 32 additional trips at the second TIP location. The first TIP was estimated to cost $12,348,000, $67,420 of which was Town & Country's proposed pro rata share. The second TIP was estimated to cost, $15,312,000, $182,703 of which was Town & Country's proposed pro rata share.
[14] The hearing examiner's decision states that Tacoma (1) conceded, as a matter of law, that it could not require Town & Country to comply with the first option, namely to "construct all TIP projects impacted by ten or more vehicular trips"; and (2) asked the hearing examiner to eliminate this language from the conditional approval. CP at 26. The hearing examiner ruled that Tacoma's conditional approval of the Scarsella plat, in its entirety, violated SEPA and RCW 82.02.020.
[15] Federal Way also defended the methodology used in its October 29, 2007 traffic analysis to estimate the traffic effect that the Scarsella plat would generate. The merits of this methodology are not before us on appeal.
[16] Cobb v. Snohomish County, 64 Wash.App. 451, 829 P.2d 169 (1991), review denied, 119 Wash.2d 1012, 833 P.2d 386 (1992); see also Castle Homes and Dev., Inc. v. City of Brier, 76 Wash.App. 95, 882 P.2d 1172 (1994).
[17] Ch. 36.70C RCW.
[18] In Finding of Fact 16, the hearing examiner found that Federal Way was planning to pursue the two TIPs regardless of whether Town & Country built the Scarsella plat and, thus, "the need for improvements planned for the [two TIPs] ... are not a direct result of the traffic expected to be contributed by Town & Country's [Scarsella plat]." CP at 31 (FF 16). In Finding of Fact 18, the hearing examiner found that Federal Way "did not actually determine the specific impact of the [Scarsella plat]" because Federal Way "did not develop information on the two TIPs for 2009 horizon year `without the project.'" CP at 32 (FF 18) (internal citation omitted).
[19] The superior court also ruled that the hearing examiner's order on reconsideration was erroneous insofar as it failed to correct the errors it had previously pointed out.
[20] The superior court also awarded Federal Way costs and fees, which are not at issue in this appeal.
[21] See Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs., 151 Wash.2d 279, 288, 87 P.3d 1176 (2004).
[22] In its appeal to the hearing examiner, Town & Country argued that, in requiring the traffic mitigation payment, the "SEPA official" (Michael Slevin, the interim director of the Tacoma Public Works Department, the agency that issued the MDNS), failed to comply with various sections of the Tacoma Municipal Code. See AR at 705-07. Town & Country also claimed that Federal Way based the SEPA traffic mitigation payment on "unreasonable" and "flawed" analysis and that the TIPs lacked a "clear nexus" with the proposed plat. AR at 706.
[23] In its prehearing memorandum, Town & Country argued that the traffic mitigation payment violated SEPA and RCW 82.02.020.
[24] In its post hearing memorandum, Town & Country again argued that the traffic mitigation payment violated SEPA and RCW 82.02.020.
[25] In this statutory mitigation context, "direct result" is also a legal term derived from RCW 82.02.020, which prohibits mitigation payments that are not "reasonably necessary as a direct result of the proposed development or plat." (Emphasis added). See, e.g., CP at 43, ("[Conclusion of Law] 16. Federal Way has failed to establish that the required ... improvements ... are reasonably necessary to mitigate the direct impact of Town & Country's proposed 51-lot subdivision.") (Emphasis added).
[26] In this SEPA administrative code mitigation context, "specific impact" is also a legal term derived from WAC 197-11-660(1)(b), which permits mitigation payments as long as they are related to "specific, adverse environmental impacts clearly identified in an environmental document on the proposal." (Emphasis added).
[27] On appeal, Town & Country apparently concedes that SEPA, standing alone, permits the government to consider cumulative impacts.
[28] "[P]roceeding from one point to another in time or space without deviation or interruption." Webster's Third New Int'l Dictionary 640 (1969).
[29] "[A] proposition having a relation to the validity of another such that . . . the second can only be valid if the first is also valid." Webster's Third New Int'l Dictionary 473 (1969).
[30] Webster's Third New Int'l Dictionary 640 (1969).
[31] "It is a canon of construction that statutes that are in pari materia may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." Black's Law Dictionary, 807 (8th ed.2004).
[32] See, e.g., State v. Stratton, 130 Wash.App. 760, 764, 124 P.3d 660 (2005) ("We look for a statute's meaning from its wording, the context in which we find the statute, and the entire statutory scheme.")
[33] RCW 82.02.020 prohibits local governments from imposing direct or indirect taxes, fees, or charges on development. Citizens for Rational Shoreline Planning v. Whatcom County, 155 Wash.App. 937, 942, 230 P.3d 1074, review granted, 170 Wash.2d 1001, 243 P.3d 551 (2010). But it "does not preclude dedications of land or easements within the proposed development or plat which the [local government] can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply." RCW 82.02.020. Neither does it prohibit "voluntary agreements with [local governments] that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat." RCW 82.02.020.

Furthermore, RCW 82.02.020 itself does not give Tacoma authority to impose the mitigation payment as a condition of approval. Citizens' Alliance for Prop. Rights v. Sims, 145 Wash.App. 649, 664, 187 P.3d 786 (2008) (citing Cobb, 64 Wash.App. at 462, 829 P.2d 169 (Agid, J., concurring and dissenting)), review denied, 165 Wash.2d 1030, 203 P.3d 378 (2009). Rather, RCW 82.02.020 provides an exhaustive list of requirements that the imposed condition must satisfy in order for the condition to be lawful and enforceable, including, for example, that authority for imposing a mitigation payment must come from an independent statutory source and that the condition must comply with RCW 82.02.020. Citizens' Alliance, 145 Wash.App. at 664, 187 P.3d 786. Here, all parties concede that SEPA is that independent source. Thus, the mitigation payment must meet the requirements of both RCW 82.02.020 and SEPA.
[34] Our Supreme Court upheld a mitigation payment imposed on a proposal that would have increased the required dedication of park land by 2.52 acres, even though there was a preexisting deficit of approximately 107 park acres and King County needed over 300 acres of additional park land within 15 years to provide for estimated population growth. See Trimen, 124 Wash.2d at 274, 877 P.2d 187. Thus, even if Tacoma designed its mitigation payment to alleviate the effects of both the Scarsella-plat-generated traffic and the traffic that future population growth will generate, Trimen allows Tacoma to require Town & Country to make a pro-rata mitigation payment to Federal Way for these purposes.
[35] Castle Homes does not counsel otherwise. Castle Homes is distinguishable from the case before us in that the City of Brier determined the mitigation payment based on the mere number of lots in a subdivision, rather than on the volume of car trips and the distribution of those trips the subdivision would generate. Brier intended to use the mitigation payment to improve traffic conditions. Castle Homes, 76 Wash.App. at 101-03, 882 P.2d 1172. Division One rejected the required mitigation payment because the worsening of the traffic conditions did not flow from the number of lots within the subdivision, but rather from the number of trips to be generated by the subdivision (which Brier did not measure). See Castle Homes, 76 Wash.App. at 108, 882 P.2d 1172. Division One held that Brier should have apportioned the mitigation payment based on the number of "the differing street distribution impacts" (in other words, "trips") of each lot within the subdivision. Castle Homes, 76 Wash.App. at 108, 882 P.2d 1172. Similarly, in the case before us, the hearing examiner found trip distribution "to be consistent with accepted transportation princip[les]," CP at 30, which is how Federal Way apportioned traffic mitigation contributions here.
[36] Town & Country does not contest this argument.
[37] As we discuss earlier, this percentage is equal to the fraction of the new car trips that the Scarsella plat will generate out of the total car trips that will use the new TIP intersections.
[38] Here, Michael P. Slevin III of the Tacoma Public Works Department was the responsible official.
[39] WAC 197-11-350(2) provides:

After submission of an environmental checklist and prior to the lead agency's threshold determination on a proposal, an applicant may ask the lead agency to indicate whether it is considering a DS. If the lead agency indicates a DS is likely, the applicant may clarify or change features of the proposal to mitigate the impacts which led the agency to consider a DS likely. The applicant shall revise the environmental checklist as may be necessary to describe the clarifications or changes.
[40] Moreover, Town & Country does not dispute the calculations used to determine these numbers.
[41] WAC 197-11-660(1)(c).
[42] "The legislature adopted RCW 82.02.050 through RCW 82.02.090 (the `GMA Impact Fee Statute') as part of the GMA in 1990. But the legislature did not place the GMA Impact Fee Statute') as part of the GMA in 1990. But the legislature did not place the GMA Impact Fee Statute in the RCW chapters governing land use control or development regulation; instead, the legislature codified it among excise taxes in RCW 82." New Castle Invs. v. City of LaCenter, 98 Wash.App. 224, 235-36, 989 P.2d 569 (1999).