# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FRIENDS OF NORTH KELSEY,

Appellant,

v.

CITY OF MONROE, a municipal corporation,

Respondent,

WAL-MART STORES, INC.,

Intervenor-Respondent.

NO. 68463-9-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: May 20, 2013

LAU, J. — Wal-Mart Stores, Inc. proposes to build a new Wal-Mart Supercenter in Monroe's North Kelsey planning area. Friends of North Kelsey (FONK) opposes Wal-Mart's proposal, claiming that (1) it violates the North Kelsey Development Plan's (plan) goals and objectives, (2) it fails to comply with the Development Plan's Design Guidelines (guidelines), and (3) it fails to qualify as a "planned action" under the State Environmental Policy Act of 1971 (SEPA). FONK appeals the city council's decision to approve the proposal under the Land Use Petition Act (LUPA), chapter 36.70C RCW. FONK (1) fails to demonstrate that the city council misinterpreted the plan or guidelines, (2) waives its challenge to most of the city council's findings and substantial evidence

nevertheless supports the findings, and (3) with one narrow exception, demonstrates no clear error in the city council's application of the law to the facts. Because the record shows no evidence and no findings to support the city council's approval decision on the lighting and linear seating guidelines, we remand for further proceedings consistent with this opinion and otherwise affirm the decision in all respects.

## FACTS

The North Kelsey planning area, zoned "general commercial," consists of approximately 100 acres of land in the city of Monroe ("City"). In 2003, the City adopted the plan, which contains development standards applicable in the North Kelsey planning area. The plan governs 55 acres of land within the North Kelsey planning area, including the "North Kelsey north area" (north of North Kelsey Street) and the "North Kelsey south area" (south of North Kelsey Street). The two areas combined constitute the North Kelsey planned development area. The City adopted a planned action final supplemental environmental impact statement (FSEIS) for the North Kelsey area in 2004 and amended the plan in 2007. The amended plan's goals and objectives include a "pedestrian-friendly center that serves as a community focus, provides public open space and amenities, and accommodates a broad range of commercial and civic activities." The plan also contains the guidelines, which address site configuration, site planning, circulation, architectural design, landscaping, signage, and lighting.

In 2010, the Monroe City Council agreed to sell 24 acres in the North Kelsey planned development area to North Kelsey LLC. The purchase and sale agreement required North Kelsey LLC to submit to the city council "a conceptual site plan for a retail shopping center or individual building . . . in accordance with the North Kelsey

-2-

Area Development Plan and North Kelsey Development Plan Supplemental

Development Agreement Provisions adopted by the Monroe City Council Resolution

2005/009."

In January 2011, PACLAND, on behalf of North Kelsey LLC and Wal-Mart Stores

Inc., applied for a binding site plan and grading permit to develop the property. The

applications specified that the development would be a Wal-Mart Supercenter. Wal-

Mart proposed to develop approximately 17 acres on the northern part of the North

Kelsey planned development area. The proposal included a 151,000 square foot Wal-

Mart store with an additional 13,000 square foot outdoor home and garden center.

Around the same time, the City and North Kelsey LLC negotiated a development

agreement under RCW 36.70B.170 to establish development terms and site vesting.[1]

PACLAND also submitted a conceptual site plan and conceptual building elevations.

These documents were presented to the city council for a public hearing and final

decision.

Prior to the city council hearing, the City's community development director and

SEPA-responsible official prepared a detailed City staff report analyzing Wal-Mart's

development proposal under the plan and guidelines. The report concluded that the

project satisfied all applicable development standards and recommended that the city

council approve Wal-Mart's proposal. The City's SEPA-responsible official also

---

[1] RCW 36.70B.170(1) allows a local government to enter into a development agreement with a person having ownership or control of real property within its jurisdiction. A development agreement "*must set forth the development standards and other provisions that shall apply to and govern and vest the development, use, and mitigation of the development of the real property for the duration specified in the agreement."

determined that the project constituted a "planned action" under WAC 197-11-172 and city of Monroe Ordinance No. 0003/2004. This action resulted in a determination that Wal-Mart's proposal satisfied applicable FSEIS conditions and mitigation measures and adequately addressed the project's probable significant environmental impacts.

In mid-March 2011, the city council held a public hearing on the development agreement and consolidated applications. City staff and Wal-Mart presented opening statements, and citizens commented on the proposal. The city council continued the hearing until late March and agreed to consider additional written comments.

Wal-Mart voluntarily proposed "revisions to the conceptual site plan and an alternative project design that respond to some of the public comment related to design and compatibility with the North Kelsey Development Plan." While Wal-Mart claimed its original site plan fully complied with the plan and guidelines, it proposed changes to include adding a second sidewalk and gathering space with benches near the North Kelsey Street entrance; installing more landscaping along the south perimeter of the storm pond; changing the entry vestibule roofs to gables; changing the building materials to include brick veneer, cultured stone, and metal panel; and adding raised landscape planters.

Wal-Mart responded to the public comments and proposed alternative designs for enhanced landscaping, pedestrian features, and building features. City staff also responded to the citizen testimony and submitted additional documents supporting its recommendation. The city council approved the development agreement, conceptual site plan, binding site plan, and grading permit. The city council's approval included several additional conditions requiring additional pedestrian features and landscaping.

-4-

The city council later adopted resolution 2011/009 formally approving Wal-Mart's conceptual site plan, development agreement, binding site plan, and grading permit. This resolution set forth the city council's findings and conclusions and also incorporated by reference comprehensive findings and conclusions in staff reports and memorandums and the development agreement. The city council also determined that Wal-Mart's proposal qualified as a planned action under North Kelsey's FSEIS. The city council denied two reconsideration motions and issued a final notice of decision.

FONK filed a land use petition with the superior court under LUPA. Wal-Mart intervened in the action.[2] The trial court denied FONK's land use petition, ruling (1) the city council properly interpreted and applied the plan and guidelines to Wal-Mart's proposal, (2) substantial evidence supported the land use decision, (3) the land use decision was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts, and (4) the city council properly determined that the project qualified as a planned action under SEPA. The court concluded, "[FONK] has not satisfied its burden of demonstrating that the challenged land use decision meets one or more of the standards for relief set forth at RCW 36.70C.130." FONK appeals.

## ANALYSIS

### Standard of Review

LUPA is the exclusive means of obtaining judicial review of land use decisions, with certain exceptions not applicable here. Friends of Cedar Park Neighborhood v. City of Seattle, 156 Wn. App. 633, 640, 234 P.3d 214 (2010). We review the decision of

---

[2] The respondents initially named in the petition were the City, North Kelsey LLC, PACLAND, and several third party respondents. In this opinion, we refer to Wal-Mart and the City collectively as "respondents."

the "local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals." RCW 36.70C.020(2). Thus, when reviewing a LUPA decision, we stand in the shoes of the superior court, reviewing the ruling below on the administrative record. HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs., 148 Wn.2d 451, 468, 61 P.3d 1141 (2003). Here, we review the city council's decision approving Wal-Mart's proposal. Under LUPA, we "may affirm or reverse the land use decision under review or remand it for modification or further proceedings." RCW 36.70C.140.

Under LUPA, a court may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in RCW 36.70C.130(1) is met. FONK cites four standards in its appellate brief:

> "(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> "(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> "(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> "(d) The land use decision is a clearly erroneous application of the law to the facts . . . ."

Appellant's Br. at 10 (quoting RCW 36.70C.130(1)). "RCW 36.70C.130(1) 'reflects a clear legislative intention that this court give substantial deference to both legal and factual determinations of local jurisdictions with expertise in land use regulation.'" City of Medina v. T-Mobile USA, Inc., 123 Wn. App. 19, 24, 95 P.3d 377 (2004).

Subsections (a) and (b) are questions of law that we review de novo.[3] Phoenix Dev., Inc. v. City of Woodinville, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). Under subsection (b), however, "we accord deference to the City Council's expertise while reviewing de novo claims that the City Council erred in interpreting its own ordinance." Chinn v. City of Spokane, ___ Wn. App. ___, 293 P.3d 401, 403-04 (2013). We thus give deference to the city council's construction of local land use regulations based on its specialized knowledge and expertise.[4] City of Fed. Way v. Town & Country Real Estate, LLC, 161 Wn. App. 17, 37, 252 P.3d 382 (2011).

"When reviewing a challenge to the sufficiency of the evidence under subsection (c), we view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority"— in this case, the City and Wal-Mart. Phoenix Dev., 171 Wn.2d at 828-29. This process "necessarily entails acceptance of the factfinder's views regarding the credibility of witnesses and the weight to be given

---

[3] FONK does not argue that the city council engaged in unlawful procedures or failed to follow a prescribed process. Subsection (a) is thus not at issue in this appeal.

[4] FONK argues, "The Court will accord deference to an agency's interpretation of its own regulations only when the regulation is ambiguous." Appellant's Reply Br. at 7-8. This rule is true for non-LUPA cases. See Green v. Dep't of Soc. & Health Servs., 163 Wn. App. 494, 508, 260 P.3d 254 (2011) (addressing de novo standard under the Administrative Procedures Act). But whether the same rule applies in LUPA cases is subject to some debate. See McTavish v. City of Bellevue, 89 Wn. App. 561, 565, 949 P.2d 837 (1998) (declining to construe unambiguous language, but noting "we have considered the expertise of the director and the hearing examiner" in deciding the issue de novo); Town & Country, 161 Wn. App. at 37 (we review challenges under RCW 36.70C.130(1)(b) de novo but only after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise); Phoenix Dev., 171 Wn.2d at 837 (deferring to city's construction of its own comprehensive plan; no discussion of ambiguity); Chinn, 293 P.3d at 404-07 (deferring to city's construction of city code even after determining plain language of code supported city's interpretation). We need not resolve this conflict given our discussion below.

reasonable but competing inferences.'" City of Univ. Place v. McGuire, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (quoting State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)). Under the substantial evidence standard, there must be sufficient evidence to "persuade a reasonable person that the declared premise is true." Phoenix Dev., 171 Wn.2d at 829. We do not weigh the evidence or substitute our judgment for the reviewing official's judgment. Phoenix Dev., 171 Wn.2d at 832.

Under subsection (d), the application of the law to the facts is clearly erroneous—and thus reversible—only if we are left with a definite and firm conviction that a mistake has been committed. Phoenix Dev., 171 Wn.2d at 829; Milestone Homes, Inc. v. City of Bonney Lake, 145 Wn. App. 118, 126, 186 P.3d 357 (2008).

Findings of Fact

As a preliminary matter, page 4 of FONK's opening brief contains one sentence assigning error "to the findings and conclusions adopted by the Monroe City Council as they are set forth in [Clerk's Papers] CP 725-737 and CP 2609-2611, including but not limited to those findings and conclusions that are quoted in this brief in Section IV.C." Appellant's Br. at 4. In Section IV.C, FONK mentions or quotes only some of the city council's findings. See Appellant's Br. at 9-47. FONK explicitly challenges sufficiency of the evidence for only one of the findings it mentions or quotes. See Appellant's Br. at 36 ("Further, the above finding that the supporting documents to the binding site and conceptual site plan show a focal open space along North Kelsey Street is not supported by substantial evidence."). For the remaining findings, FONK merely quotes the finding and summarily argues that the city council's conclusion was clearly

-8-

erroneous. FONK also argues that the lack of findings on certain issues makes the conclusion clearly erroneous.

Respondents argue that FONK's inadequate factual challenges constitute verities on appeal. See United Dev. Corp. v. City of Mill Creek, 106 Wn. App. 681, 688, 26 P.3d 943 (2001) (local land use decision maker's unchallenged findings of fact are verities on appeal). We agree, except for the challenged finding quoted above.[5] We decline to address FONK's sufficiency of the evidence claims, except as noted on grounds discussed above. "RAP 10.3 requires appellant to present argument to the reviewing court as to why specific findings of fact are in error and to support those arguments with citation to relevant portions of the record." In re Disciplinary Proceedings Against Whitney, 155 Wn.2d 451, 466, 120 P.3d 550 (2005); see also RAP 10.3(g) ("A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number."). When challenges to findings of fact are insufficiently briefed, we decline to address those challenges and consider the findings verities on appeal. Whitney, 155 Wn.2d at 467; United Dev., 106 Wn. App. at 688. See also Valley View Indus. Park v. City of Redmond, 107 Wn.2d 621, 630, 733 P.2d 182 (1987) (city assigned error to 21 of the trial court's findings of fact, but its opening brief mentioned only two of the findings to which it assigned error; court held,

---

[5] And even for that finding, FONK failed to specifically challenge it in an assignment of error as discussed above. We question whether quoting the finding and challenging sufficiency of the evidence for that finding in the analysis portion of the brief is sufficient. RAP 10.3(g) indicates such argument is insufficient: "A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number." (Emphasis added.)

"Such discussion is inadequate for all except the two mentioned findings. A party abandons assignments of error to findings of fact if it fails to argue them in its brief.") (emphasis added); Seattle Sch. Dist. No. 1 of King County v. State, 90 Wn.2d 476, 488, 585 P.2d 71 (1978) ("Appellants have assigned error to 9 of 698 findings of fact. Except for number 172 and 446 no other finding is again referred to in appellants' brief by identifiable number or otherwise. Three other findings are mentioned without actual argument in the reply brief. Since there is no further argument, discussion or reference to these findings, we deem them abandoned."). (Emphasis added.)

We discuss below FONK's properly challenged finding for substantial evidence.

City Code Interpretation

FONK's main arguments claim that the city council misinterpreted its own city code. Specifically, FONK claims that the guidelines' use of the term "should" means a particular guideline is mandatory with only limited exceptions and that the city council "erred repeatedly . . . when it interpreted 'should' throughout its decision as completely discretionary despite the code language saying otherwise." Appellant's Br. at 15.

"'It is a well established rule of statutory construction that considerable judicial deference should be given to the construction of an ordinance by those officials charged with its enforcement.'" Citizens for a Safe Neighborhood v. City of Seattle, 67 Wn. App. 436, 440, 836 P.2d 235 (1992) (quoting Mall, Inc. v. Seattle, 108 Wn.2d 369, 377, 739 P.2d 668 (1987)); see also Gen. Motors Corp. v. City of Seattle, 107 Wn. App. 42, 57, 25 P.3d 1022 (2001). As noted above, "we accord deference to the City Council's

expertise while reviewing de novo claims that the City Council erred in interpreting its own ordinance." Chinn, 293 P.3d at 403-04.

To determine whether the city council misinterpreted its development regulations, we follow general principles of statutory construction. City of Gig Harbor v. N. Pac. Design, Inc., 149 Wn. App. 159, 167, 201 P.3d 1096 (2009). "We look first to the plain language of the provisions at issue; and we strive to read them harmoniously to give effect to all, avoiding an incongruous reading potentially nullifying other provisions." Chinn, 293 P.3d at 404. "Where one provision treats a subject in general terms and another treats the same subject in a more detailed way, the specific prevails over the general absent a contrary legislative intent." Chinn, 293 P.3d at 404.

The North Kelsey design guidelines state:

> The application of these design guidelines will be a critical regulatory tool in implementing the community's design-related goals and objectives for the North Kelsey Planning Area and the North Kelsey Planned Development Area.

The guidelines also state:

> The City retains full authority to determine whether or not a proposal meets these guidelines. Within the guidelines, certain words are used to indicate the relative importance and priority the City places upon the particular guideline. The words "shall," "must," and "is/are required" mean that the development proposal must comply with the guideline unless the City finds that:
> - The guideline or requirement is not applicable or appropriate in the particular instance, or
> - The development proposal meets the intent of the guidelines in some other manner.
>
> The word "should" means that the development proposal will comply with the guideline unless the City finds that:
> - The guideline or requirement is not applicable or appropriate in the particular instance,
> - The development proposal meets the intent of the guidelines in some other manner, or
> - There is a compelling reason to the contrary.
> . . . .

> The project proponent may submit proposals that he/she feels meet the intent of the guidelines but not necessarily the specifics of one or more guidelines. In this case, the City will determine if the intent of the guideline has been met.

(Emphasis added.)

Here, one city council conclusion in resolution 2011/009 addressed construction of the term "should" in the design guidelines. The city council's "blanket statement,"[6] quoted below, concluded that Wal-Mart's proposal either met the plan's mandatory guidelines or fell within an exception to the mandatory "should" language:

> The City Council specifically notes that the North Kelsey Design Guidelines were intended to be interpreted and applied with flexibility. Where the term "should" is used in the Design Guidelines as a compliance standard with respect to particular guidelines or requirements, the City Council concludes that [Wal-Mart's] proposal satisfies these guidelines and requirements. The City Council further concludes that even if [Wal-Mart's] proposal did not satisfy these guidelines and requirements, application of these guidelines and requirements is either inapplicable or inappropriate in this instance or on this portion of the North Kelsey Planning Area and/or that [Wal-Mart's] proposal meets the intent of the Design Guidelines in some other manner.

(Emphasis added.)

The guideline language at issue here is unambiguous. It expressly provides that guidelines using the term "should" are mandatory unless the city council finds that one of the enumerated exceptions applies. FONK reads the guidelines' disputed language as absolutely mandatory rather than discretionary. It also mischaracterizes how the city council addressed this issue. By providing exceptions to the mandatory provisions and explicitly allowing applicants to submit proposals that meet the guidelines' intent but not necessarily their specific directives, the guidelines on their face vest the city council with discretion to find that a particular guideline need not be met. This discretionary

---

[6] For accuracy, we use FONK's reference to the disputed resolution provision as a "blanket statement." Appellant's Br. at 16 n.4.

language clearly indicates the guidelines were intended to be flexible. FONK claims that the city council "concluded that the word 'should' in a Design Guideline means that the Design Guideline is entirely optional and can be disregarded by the City Council if it so chooses" and erroneously "interpreted 'should' throughout its decision as completely discretionary despite the code language saying otherwise." Appellant's Reply Br. at 6; Appellant's Br. at 15. Nothing in the guidelines' plain text or the record supports this claim. As quoted above, the city council concluded that Wal-Mart's proposal either (1) met the mandatory guidelines or (2) fell within one or more exceptions to the mandatory guidelines.

FONK essentially challenges resolution 2011/009's language underscored above, which concluded that where Wal-Mart's proposal failed to meet specific guidelines, the guidelines were inapplicable or Wal-Mart met the intent in some other manner. It argues, "The [City] Council cannot simply make this blanket statement with no indication of which specific guidelines they are referring to, and with no identification of evidence in the record to support the conclusion. This is a blatant attempt to disregard the requirements of the Plan without any analysis or evidence to support that decision." Appellant's Br. at 16 n.4. On two narrow guideline categories only—lighting fixture height and linear feet of seating—the record shows no evidence or finding to support the city council's conclusion as discussed under the "Public Open Space" heading.

FONK also suggests that additional administrative findings are necessary in addition to a finding that one of the exceptions to the mandatory guidelines applies. For

example, even if the city council clearly indicates that Wal-Mart met the intent of a particular set of guidelines, FONK argues that it must further explain that finding. FONK cites no authority for this argument. See State v. Logan, 102 Wn. App. 907, 911, 10 P.3d 504 (2000) ("'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'") (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)). Nothing in the guidelines requires the city council to enter further findings supporting its alternative determination that an exception to the guidelines exists. The only required findings were met where the city council clearly indicated that Wal-Mart met the guidelines' intent (or another exception applied). See Tugwell v. Kittitas County, 90 Wn. App. 1, 14-15, 951 P.2d 272 (1997) (land use decisions will not be remanded for more complete findings where "[n]othing would be accomplished, other than further delay;" court rejected claim that findings were "so incomplete that they prevent meaningful judicial review" where board of county commissioners' findings "impliedly but clearly resolved the issues involved"); Citizens Alliance To Protect Our Wetlands v. City of Auburn, 126 Wn.2d 356, 369, 894 P.2d 1300 (1995) (rejecting challenge to hearing examiner's findings where examiner's ruling contained "substantial analysis of every issue. Because a reviewing court can determine the basis for her decision, the hearing examiner's findings are sufficient.").

Development Plan Goals[7]

Chapter 1, section C of the development plan sets forth six goals. Each goal includes a list of corresponding objectives. After considering each of the six goals, the city council concluded, "The proposed binding site plan, supporting documents, and conceptual site plan meet the Goals and Objectives of the North Kelsey Development Plan." FONK argues that this conclusion was clearly erroneous. While FONK acknowledges, "The use proposed by Wal-Mart was consistent with the [North Kelsey Development] Plan," it argues that "the design and layout of the proposal were inconsistent with the Plan." Appellant's Br. at 2. FONK specifically claims that Wal-Mart's proposal is inconsistent with goals 2, 4, and 5.

Goal 2

Goal 2 is to "Create a focal point as a community gathering spot." Specific objectives associated with goal 2 are:

> Create a plaza open space to accommodate at least 1,000 people for special community events; Design the plaza open space to be adoptable to a variety of events and uses; Design the plaza open space to be safe and welcoming, casual and comfortable; Include a modest water feature within the plaza open space.

The city council found with respect to goal 2:

> Findings: The Development Plan indicates that the "Village Green" and "Focus Plaza" areas will be located on the southern site of North Kelsey. As part of the

---

[7] We note that FONK cites no authority requiring the city council to make findings or conclusions regarding the plan's goals. FONK also cites no authority requiring land use proposals to comply with the goals and objectives or even to address them. The plan's "Goals and Objectives" appear to be broad, general goals relating to development of the North Kelsey planning area as a whole. In contrast, the plan's guidelines—set forth in another section of the plan—impose specific requirements that developers must address in their proposals. We address the guidelines in the relevant section below. Nevertheless, we analyze the challenged goals and objectives here for completeness.

binding site plan, the project proponent intends to dedicate a corner pedestrian feature to the city of Monroe for public use. (Exhibits 2a, 2b, 3, and 4a)

FONK acknowledges, and the city council concluded, that the plaza contemplated in goal 2 will be located "on the southern site of North Kelsey." FONK nevertheless contends that the Wal-Mart site (the northern parcel of the North Kelsey planning area) "plays a key role in furthering [Goal 2]." Appellant's Br. at 18. FONK argues that Wal-Mart's proposal to develop the northern parcel violates goal 2 because it lacks sufficient connectivity with the southern site and does not foster a campus-like character. Appellant's Br. at 18-20. In support of this claim, FONK cites to various design guidelines as well as the plan's "Development Concept,"[8] which is located in a different chapter. But goal 2 mentions neither pedestrian connections nor a campus-like character. FONK fails to cite any binding requirement imposed by goal 2 that Wal-Mart's proposal violates. Goal 2 merely encourages a "plaza open space" to be located on another site in the North Kelsey planning area. Even assuming FONK's unsupported claim that "[t]he Goals and Objectives, the Development Concept, and the Design Guidelines are all inextricably interconnected," FONK cites to provisions addressing connectivity between the north and south parcels and development of the north parcel. Appellant's Reply Br. at 17. Even if Wal-Mart's proposal violates those provisions,

---

[8] The development concept is chapter 3 of the plan. It is intended to translate the North Kelsey area's planning objectives into physical design principles. The Development Concept contains several illustrations depicting the plan's objectives. These figures are intended to provide examples, not binding requirements. See Clerk's Papers (CP) at 314 ("Development concept"); CP at 315 ("Proposed cross-section of the east/west connector road"); CP at 317 ("Hypothetical development plan") (emphasis added).

FONK fails to show that this failure would affect goal 2—which is merely to "Create a

focal point as a community gathering spot" on the south parcel.[9]

Goal 4

Goal 4 is to "Create a strong identity for the development." Specific objectives

associated with goal 4 are:

> Encourage site and architectural design that is unique and appropriate for Monroe; Encourage architectural design that combines traditional and modern elements; Emphasize landscaping and greenery throughout the development to create a park-like setting; Encourage architectural design that is understated and subtle; Employ local artists, where possible, in the design of public spaces and the streetscape.

Regarding goal 4, the city council found:

> Findings: The conceptual elevations (Exhibit 4b) emphasize façade modulation, variation in materials, and variation in color, among other desirable architectural design elements. The supporting documents to the binding site plan (Exhibit 2b) and conceptual site plan (Exhibit 4a) include detailed landscape drawings that show landscaping along the site's perimeter, throughout the parking area, and around the stormwater detention area.

FONK contends, "The Wal-Mart will dominate the area's identity with a formulaic,

typical superstore Wal-Mart aesthetic." Appellant's Br. at 20-21. It claims the city

council "ignor[ed] the massing and orientation of the building" and also argues that

"[p]aint colors and vestibules on top of a massive Wal-Mart structure do not create a

---

[9] Regardless, the city council found Wal-Mart's proposal consistent with all of the plan's goals based on "pedestrian connections throughout the site as well as connections to the southern site," "a plaza area adjacent to the main entrance that will include specialty paving, public seating, and landscaping," and the corner pedestrian feature dedicated to public use. As discussed below in the design guidelines analysis, those unchallenged findings are supported by substantial evidence. FONK's complaints regarding the size, appearance, and orientation of the various features in Wal-Mart's proposal go to weight of the evidence. As noted above, we do not weigh the evidence or substitute our judgment for the reviewing official's judgment. Phoenix Dev., 171 Wn.2d at 832.

strong identity for this area." Appellant's Br. at 21. However, goal 4 mentions neither orientation nor massing[10] and, by its terms, provides only "encouragement" regarding architectural design and landscaping, not binding regulatory standards. The City's staff report and the city council concluded that Wal-Mart's original site plan proposal met goal 4 by incorporating numerous architectural and landscaping features. Substantial evidence supports the findings. The revised site plan, as modified and conditioned by the city council, further enhances the project's consistency with goal 4. The building design incorporates textures, elements, materials, and colors that correlate to the local aesthetic and includes design elements such as gabled roofs, multiple paned windows, awnings, canopies, brick and cultured stone veneers, timber-like elements, architectural blocks, and pedestrian-scale lighting. The design also incorporates multiple pedestrian connections; a plaza area with specialty paving, public seating, and landscaping; and parking areas screened by landscaping. FONK's complaints regarding the size, appearance, and orientation of the various features in Wal-Mart's proposal go to the weight of the evidence. As noted above, we do not weigh the evidence or substitute our judgment for the reviewing official's judgment. Phoenix Dev., 171 Wn.2d at 832. FONK fails to show clear error in the city council's determination that Wal-Mart's proposal met goal 4.

Goal 5

Goal 5 is to "[e]ncourage pedestrian-friendly development." Specific objectives include:

_____

[10] Nothing in the plan prohibits large buildings. The plan specifically contemplates and allows "big-box" retail uses that otherwise comply with the development guidelines.

-18-

Provide safe, efficient, and attractive pedestrian connections between uses throughout the development area and to uses surrounding the site; Encourage small-scale businesses such as cafes and specialty shops; Encourage building design that orients to public open space, pathways, and streets; Develop streets with pedestrian amenities such as wide sidewalks, awnings, street trees and landscaping, and buildings with display windows; Provide separation of vehicles and pedestrians, where possible, along arterials; Hide and screen parking areas; Incorporate safe bicycle access to and throughout site; Encourage large-scale retail uses to provide multiple entries and minimize blank walls; Provide pedestrian-oriented plazas and open spaces throughout the development.

Regarding goal 5, the city council found:

Findings: The binding site plan includes pedestrian connections throughout the site as well as connections to the southern site. Stamped and colored concrete, common to the greater development, define entryways and connections to the site. Perimeter landscaping screens the parking areas along Galaxy Way and North Kelsey Street. The site will include paths, sidewalks, and bike racks to accommodate pedestrian and bicycle access. The conceptual elevations include two pedestrian entries into the development. (Exhibits 2a, 2b, 3, and 4a) Findings: As noted in the findings to Goal 4, the proponent has included a variety of design elements including multiple features along the front and right elevation facades. The binding site plan and supporting documents include informal open spaces between North Kelsey Street and Lot 1 of the proposed development; a plaza area adjacent to the main entrance that will include specialty paving, public seating, and landscaping; and a corner pedestrian feature at Galaxy Way and North Kelsey Street for public use. (Exhibits 2a, 2b, 3, and 4a)

FONK contends, "Wal-Mart's proposal encourages driving to the site and parking to get to the store." Appellant's Br. at 22. According to FONK, the city council's findings "miss[] the point entirely with respect to Goal 5. The Council focuses on pathways that are added as afterthoughts and that are secondary to the primary car-focused site configuration. . . . The findings ignore that the central method of transportation that is encouraged by this design is cars, not pedestrians." Appellant's Br. at 23. As noted above, the city council found that Wal-Mart's proposal included landscaping, both internally and at the site's perimeter, stamped and colored concrete entryways and

-19-

connections, pedestrian paths and sidewalks, informal open spaces, a plaza area, and other features consistent with goal 5. Substantial evidence supports these findings. FONK offers no more than subjective disagreement with the city council's findings and its own lay opinion that Wal-Mart's design encourages driving rather than walking. Although FONK dismisses the proposal's pathways and other pedestrian features as "afterthoughts," it does not—and cannot—deny their incorporation into the challenged proposal. As noted above, we do not weigh the evidence or substitute our judgment for the reviewing official's judgment. Phoenix Dev., 171 Wn.2d at 832. FONK fails to show clear error in the city council's determination that Wal-Mart's proposal met goal 5.

### Design Guidelines Compliance

FONK argues that Wal-Mart's proposal violates several of North Kelsey's design guidelines. The guidelines are divided into several categories, including "Site Configuration," "Site Planning," "Circulation," "Architectural/Building Design," and "Landscape Design." The guidelines set forth several general intent statements applying to all guidelines and specific intent statements within particular categories of guidelines. The general intent statements applying to all guidelines are as follows:

> These guidelines are directed to creating a development within the North Kelsey planning area that:
> - Provides a visible and accessible commercial and civic town focus for the City of Monroe.
> - Enhances downtown circulation for pedestrians and vehicles.
> - Connects and integrates other downtown activities.
> - Features a spectrum of public open spaces and amenities.
> - Includes a mix of commercial, civic, recreational and residential activities.
> - Retains opportunities north of North Kelsey Street for a larger activity in a master-planned setting such as an educational or medical facility or a corporate campus.

- Accommodates retail development of various size and character as long as the development's perceived scale is appropriate for Monroe's small town character and the design quality is of the highest caliber.
- Enhances the town's identity as a regional attraction.

We address the specific intent statements below. FONK challenges Wal-Mart's compliance with the guidelines in the "Site Configuration," "Site Planning," and "Architectural/Building Design" categories. Appellant's Br. at 23, 31, 43.

<u>Site Configuration</u>

The site configuration guidelines require that binding site plans address five principles. The guidelines specify that project proponents "must demonstrate that the overall site layout and circulation system accomplishes these goals to the City's satisfaction." Principles 1 and 2 require that development north of North Kelsey Street "[c]onnects to [the remainder of the North Kelsey planning area] with an integrated pedestrian network. . . . Gateway features and safe walking connections must be provided at these points" and that "[u]ses North of North Kelsey Street should be compatible and mutually supportive" of the retail, recreational, and civic uses at the core of the south lot. FONK does not challenge the city council's conclusion that Wal-Mart adequately addressed these two principles.

Principle 3 provides, "Uses north of North Kelsey Street should be configured around a central open space or plaza to create a campus-like setting." The city council's findings on this issue state:

> <u>Findings</u>: The Development Plan indicates that the "Village Green" and "Focus Plaza" areas will be located on the southern site of North Kelsey. The suggestion of a campus-like setting on the northern portion of the property is a discretionary and not mandatory element of the North Kelsey Design Guidelines not applicable to this proposed use.

Findings: The binding site plan, supporting documents, and conceptual site plan include significant landscaping around the site's perimeter and adjacent to North Kelsey Street, a plaza area adjacent to the main entrance to the retail store, and a corner pedestrian feature. Pathways connect the internal features and public sidewalks on North Kelsey Street and the Galaxy Way corner feature to the future development.

Findings: The binding site plan, supporting documents, and conceptual site plan illustrate that the northern site is organized around a large anchor retail store with two smaller "out lots" that will provide compatible uses to the proposed anchor, consistent with Chapter 3, Concept 8. The drawings also show that the main entrance to the northern site aligns with the southern site to support automobile and pedestrian access. Internally, the northern site includes pedestrian paths and walkways to and from the retail store. (Exhibits 2a, 2b, 3, and 4a)

Principle 4 provides for "a public road to the south of the lot that, along with North Kelsey Street and Chain Lake Road, creates a loop system around the south parcel. . . . Parking for the facility should be accessed from this loop system and not intrude into the center of the site [or] detract from the activities or qualities of the development." The city council's findings on this issue state:

Findings: The binding site plan, supporting documents, and conceptual site plan show pedestrian connections between the proposed development along Galaxy Way to the west, North Kelsey Street to the south, and along the public sidewalk to the east up to Chain Lake Road. The main entrance to the northern site aligns with the southern site to support automobile and pedestrian access. Internally, the northern site shows pedestrian paths and walkways to and from the retail store. (Exhibits 2a, 2b, 3, and 4a)

Finally, principle 5 provides that developments should "[l]ocate[] and treat[] large buildings to reduce their perceived scale to fit with neighboring structures and present an inviting, human-scaled, pedestrian oriented character to the public." The city council's findings on this issue state:

Findings: As noted in findings for Chapter 1, Goal 4 and Chapter 3, Goals 5 and 6, the conceptual drawings emphasize façade modulation, variation in materials, and variation in color, among other architectural design elements. The supporting documents to the binding site plan and conceptual site plan include detailed landscape drawings that show landscaping along the site's perimeter,

throughout the parking area, and around the stormwater detention area. (Exhibits 2a, 2b, 3, and 4a)

The city council concluded after addressing all of the principles:

Conclusions: The proposed binding site plan, supporting documents, and conceptual site plan meet the Site Configuration Principles of the North Kelsey Development Guidelines by providing interconnectivity, compatible land uses, public open spaces, and desirable architectural features and site design elements. Even where the proposal does not strictly satisfy the specifics of a particular design guideline, the proposal as a whole complies with the North Kelsey Design Guidelines when the totality of all proposed features are considered.

Regarding principle 3, FONK argues that the Wal-Mart store "is not configured around a central open space or plaza to create a campus-like setting." Appellant's Br. at 24. FONK challenges the city council's determination that "[t]he suggestion of a campus-like setting on the northern portion of the property is a discretionary and not mandatory element of the North Kelsey Design Guidelines not applicable to this proposed use." As discussed above, the guidelines are discretionary. The city council may approve proposals that vary from the specific guidelines if it finds them inapplicable or inappropriate or finds that the proposal meets the guidelines' overall intent. Here, the city council found the "campus-like setting" guideline "not applicable" to Wal-Mart's proposed use. FONK disputes this characterization.[11] But even if the city council erred

_____

[11] FONK claims that the campus-like setting requirement clearly applies to the north site (where Wal-Mart will be located). The respondents contend, "[T]he mere fact that the guideline applies to the area where the Wal-Mart store is proposed to be located does not mean that the City Council does not have the discretion to find that the guideline is not applicable 'in a particular instance.'" Wal-Mart Br. at 28 (quoting North Kelsey development plan design guidelines). The respondents' argument is more convincing. The design guidelines allow the city council to approve deviations from a guideline if it "is not applicable or appropriate in the particular instance." (Emphasis added.) This gives the city council considerable discretion to conclude, as it did here, that a proposal involving construction of a "big-box" retail facility would prevent the

in stating that the guideline was "not applicable" to Wal-Mart's proposed use, it clearly concluded that Wal-Mart's proposal met the site configuration guidelines' intent "when the totality of all proposed features are considered," even if the proposal failed to satisfy the specifics of particular guidelines. The site configuration guidelines expressly acknowledge the city council's discretion to make this type of judgment: "The project proponent must demonstrate that the overall site layout and circulation system accomplishes these goals to the City's satisfaction." (Emphasis added.) Because the city council clearly expressed its conclusion in this section, we need not remand for further clarification on this issue. See Tugwell, 90 Wn. App. at 14-15 (land use decisions will not be remanded for more complete findings where board of county commissioners' findings "impliedly but clearly resolved the issues involved" and, thus, "[n]othing would be accomplished [by remand], other than further delay"); Citizens Alliance, 126 Wn.2d at 369 (rejecting challenge to hearing examiner's findings where examiner's ruling contained "substantial analysis of every issue. Because a reviewing court can determine the basis for her decision, the hearing examiner's findings are sufficient.").

Regarding principle 4, FONK argues, "It is plainly evident from looking at Wal-Mart's site plan that the parking areas are intruding into the center of the site and they detract from the pedestrian activities and qualities of the development." Appellant's Br.

---

simultaneous preservation of a large central open space on the site. As noted above, the city council concluded that the proposal as a whole complied with the design guidelines "when the totality of all proposed features are considered." The site configuration guidelines expressly acknowledge the city council's discretion to make this type of judgment: "The project proponent must demonstrate that the overall site layout and circulation system accomplishes these goals to the City's satisfaction." (Emphasis added.)

at 28. FONK also claims the pedestrian crosswalk on North Kelsey Street is "poorly located."[12] Appellant's Br. at 28. We question whether principle 4 applies to the northern part of the North Kelsey planning area. The language regarding a "loop system" and requiring parking not to intrude into the center of the site refers to the southern portion of the North Kelsey planning area. FONK claims that figure 5, which corresponds to principle 4, "clearly shows that parking is planned to be outside of the contemplated open space, campus-like area on the north site as well as on the south site." Appellant's Reply Br. at 23. But figure 5 is titled "Vehicle access and parking concept," and FONK cites no authority for its argument that such a diagram creates binding requirements for applicants. (Emphasis added.) Beal for Martinez v. City of Seattle, 134 Wn.2d 769, 777 n.2, 954 P.2d 237 (1998) ("The City cites no authority for this proposition and, thus, it is not properly before us.") (citing RAP 10.3(a)(5); Schmidt v. Cornerstone Invs., Inc., 115 Wn.2d 148, 166, 795 P.2d 1143 (1990)).

Even if principle 4 applies to the north site, the city council's findings indicate it concluded that the proposal was consistent with or met the intent of the site configuration guidelines. See CP at 174 (noting pedestrian features in response to Principle 4's requirement that parking not intrude into the center of the site and concluding, "Even where the proposal does not strictly satisfy the specifics of a particular design guideline, the proposal as a whole complies with the North Kelsey

---

[12] FONK cites to no language in principle 4 addressing pedestrian crosswalks, so it is unclear how this argument relates to FONK's other challenges regarding parking. Regardless, FONK cites to no evidence supporting its conclusory assertion regarding the pedestrian crosswalk on North Kelsey Street. FONK relies solely on figure 5, which provides only one "parking concept" as discussed above. (Emphasis added.) And the city council specifically conditioned its approval of Wal-Mart's proposal on a realignment of the North Kelsey Street crossing to improve pedestrian safety.

Design Guidelines when the totality of all proposed features are considered."). The guidelines clearly give the city council discretion to make this conclusion. FONK fails to demonstrate clear error.

Regarding principle 5, FONK argues that the Wal-Mart proposal "does not locate or treat large buildings to reduce their perceived scale . . . . Rather, the building is a typical, formulaic Wal-Mart that will appear enormous and not present an inviting human scaled, pedestrian oriented character to the public." Appellant's Br. at 29. FONK essentially faults the city council for not parroting principle 5's language. In response to principle 5's requirement that applicants "[l]ocate[] and treat[] large buildings to reduce their perceived scale to fit with neighboring structures and present an inviting, human scaled, pedestrian oriented character to the public," the city council found that Wal-Mart's proposal includes façade modulation, variation in materials and color, landscaping, and other architectural elements. FONK cites no authority for its argument that "[t]he addition of awnings, canopies, and entry vestibules of lowered height do not address the massing of the building. Nor do they address the orientation of the building." Appellant's Br. at 30. FONK cites to no guidelines prohibiting the proposed Wal-Mart store's size, location, or orientation.[13] And FONK's factually unsupported characterization of the proposed retail building as a "typical, formulaic Wal-Mart" is insufficient to demonstrate clear error. Appellant's Br. at 29.

---

[13] The North Kelsey development plan explicitly allows "big-box" retail uses in the northern portion of the North Kelsey planning area "as long as they are sited and designed to meet other plan objectives." To the extent FONK relies on figure 6 (which corresponds to principle 5) to argue that the proposed Wal-Mart store's size, location, and orientation are impermissible, that figure is titled "Ways of reducing the scale of large buildings" and in no way establishes binding requirements. (Emphasis added.)

FONK fails to demonstrate clear error in the city council's conclusions regarding Wal-Mart's compliance with the plan's site configuration guidelines. We affirm the city council's decision on these issues.

### Site Planning

North Kelsey's site planning guidelines address public open space, building orientation, land uses, parking areas, and street corners/highly visible locations. FONK's arguments address the public open space, parking areas, and street corners/highly visible locations categories.

### Public Open Space

With respect to public open space, the intent is:

- To provide a variety of open spaces that attract people to the area;
- To provide a focal open space that functions as a community gathering space;
- To provide a "park-like" character within the Planned Development Area of the North Kelsey Planning Area;
- To provide an attractive pedestrian environment;
- To provide outdoor spaces for relaxing, eating, socializing, and recreating.

Under the public open space guidelines, FONK specifically challenges the city council's conclusions regarding certain guidelines for "Pedestrian-Oriented Spaces" and the "North Building Site."

FONK claims that Wal-Mart failed to meet the following pedestrian-oriented spaces guidelines:

3. Lighting fixtures should be approximately 10-15 feet above the surface and may be building mounted. The overall lighting in the plaza should be at least 2-foot candles, without any "dark spots" that could cause security problems. Ambient light from under canopies or storefronts may be included in the lighting calculations.

. . . .

68463-9-I/28

6. At least one linear foot of seating area (at least 16 inches deep) or one individual seat per 60 square feet of plaza area or open space should be included (seating can include benches, low walls, stairs, or ledges).

Regarding the above guidelines, the city council adopted the following staff report findings and conclusions:

> Findings: Chapter 3 of the North Kelsey Design Guidelines proposes development of the Focal Plaza, Village Green, and Shopping Corridor, and pedestrian-oriented spaces on the southern site.
> Findings: As noted above, the proposed development for the northern site includes pedestrian amenities, pathways, landscaped areas, public seating, lighting, focal points, as well as textured and colored concrete in different areas (Exhibits 2b, 4a, and 4b).
>  . . . .
> Conclusions: The proposed development of the northern site provides varied open spaces, attractive pedestrian-oriented spaces, and pedestrian amenities.

The city council also adopted the following findings and conclusions addressing the requirements of chapter 7 of the design guidelines (signage and lighting):

> Findings: The binding site plan, supporting documents, conceptual site plan, and conceptual elevations include conceptual lighting details. Complete review of lighting standards will be under a separate permit. (Exhibits 2a, 2b, 4a, and 4b)
> Conclusions: The preliminary sign and lighting concept for the northern site is generally consistent with the sign and lighting criteria for the Planned Development Area. The city will address final design modifications at the time of sign permit and building permit application.

The city council made no specific finding regarding the height of lighting fixtures or the number of linear feet allocated for seating areas. It also made no specific finding that Wal-Mart's proposal met the intent of the public open space guidelines despite not meeting certain specifics in those guidelines.

FONK argues that no evidence in the record supports a conclusion that Wal-Mart met the guidelines regarding height of lighting fixtures and linear feet of seating and that these specific guidelines are "not mentioned in the City Council's decision and the

-28-

Council made no findings on this issue." Appellant's Br. at 32. The respondents

counter, "The City's review and approval of lighting fixtures was specifically reserved for

a separate, future permitting process" and claim that "[FONK] cannot meet its burden of

demonstrating clear error by assuming that the City will not apply its own code

requirements at some point in the future." Br. of Respondent City of Monroe at 34; Br.

of Intervenor Respondent Wal-Mart Br. at 32.[14]

The respondents' argument regarding future permitting misses the point. Here,

no evidence and no findings address whether Wal-Mart complied with the specific,

mandatory lighting and seating guidelines. The record evidence indicates that lighting

---

[14] In its statement of additional authorities, Wal-Mart cites Friends of the Law v. King County, 123 Wn.2d 518, 869 P.2d 1056 (1994) and Topping v. Pierce County Bd. of Comm'rs, 29 Wn. App. 781, 630 P.2d 1385 (1981) for the proposition that the city council properly approved Wal-Mart's proposal without either finding that it complied with the mandatory lighting and seating requirements or imposing specific conditions requiring such compliance in the future.
These cases are distinguishable. Topping addressed a board of commissioners' approval of a preliminary plat without evidence showing compliance with a specific Washington Administrative Code health regulation. Topping, 29 Wn. App. at 782. The court affirmed, noting that "compliance with specific health regulations applicable to a completed development is not required for approval of a preliminary plat" and "[m]atters which are specified by regulation or ordinance need not be considered unless conditions or infirmities appear or exist which would preclude any possibility of approval of the plat." Topping, 29 Wn. App. at 783 (emphasis added). In Friends, the city council approved a preliminary plat application "subject to modifications which will bring it into compliance with all applicable zoning requirements." Friends, 123 Wn.2d at 529. The city council there imposed specific conditions for meeting all zoning requirements, and it was unchallenged that compliance with the mandated conditions would result in compliance with all zoning requirements. Friends, 123 Wn.2d at 528. In contrast, here, the city council imposed no specific conditions regarding future compliance with the lighting and seating requirements. As the Friends court noted, "[I]t is up to local governments to decide what level of specificity they will require from a developer in its initial application . . . ." Friends of the Law, 123 Wn.2d at 528. Here, the plan imposes specific, mandatory lighting and seating requirements that the city council must review at the development proposal stage. As discussed above, it failed to adequately do so.

and seating will be provided but fails to indicate whether the lighting will meet height requirements or whether the seating will meet ratio requirements. Indeed, our review is hampered by the absence of any supporting evidence in the record and the absence of specific findings on the lighting and seating issue. The respondents cite to no authority permitting the city council to approve the proposal while deferring an essential guideline requirement for a future date. The city council's resolution contains no explicit statement conditioning approval on compliance at a later time. The resolution is at least ambiguous as to whether Wal-Mart must make a further showing—subject to challenge by groups such as FONK—to secure approval of its proposal.

If the decision by the city council forecloses further review of Wal-Mart's evidence of compliance with the plan and guidelines, then it has denied FONK any opportunity to challenge the evidence and the potential noncompliance.[15] FONK is entitled to an express determination of the lighting and seating issue and an opportunity to challenge it, if warranted, before final approval. See Knight v. City of Yelm, 173 Wn.2d 325, 343-45, 267 P.3d 973 (2011) (addressing a similar situation involving preliminary plat approval where the city council failed to condition approval on a showing of adequate water provision at a later date and, thus, removed any burden on the city to make an adequate showing; court concluded that petitioner was entitled to clarification of city council's decision). We remand the lighting and seating issue for further proceedings consistent with this opinion.

---

[15] And as discussed above, the city council's blanket statement that Wal-Mart's proposal meets the intent—if not the specifics—of the guidelines is inadequate to overcome this deficiency.

68463-9-I/31

Regarding the north building site category, FONK claims Wal-Mart failed to meet the following guidelines:

1. Development of the site north of North Kelsey Street should be organized around an interconnected set of heavily landscaped open spaces.
2. The north site should include a focal open space that fronts on North Kelsey Street and is aligned with the Village Green. This open space must be developed consistent with the Pedestrian-Oriented Spaces guidelines.

The city council adopted the following staff report findings and conclusions regarding the north building site guidelines:

> Findings: The supporting documents to the binding site and conceptual site plan and conceptual elevations include detailed landscape drawings that show different types of open space associated with the retail development of the northern site that includes landscaping along the site's perimeter, throughout the parking area, and around the stormwater detention area; a plaza area adjacent to the main entrance to the retail store with pedestrian seating, landscaping, and an enhanced "hardscape"; and a corner pedestrian feature at Galaxy Way and North Kelsey Street (Exhibits 2b, 4a, and 4b)
> Findings: Chapter 3 of the North Kelsey Design Guidelines proposes development of the Focal Plaza, Village Green, and Shopping Corridor and pedestrian-oriented spaces on the southern site.
> Findings: As noted above, the proposed development for the northern site includes pedestrian amenities, pathways, landscaped areas, public seating, lighting, focal points, as well as textured and colored concrete in different areas (Exhibits 2b, 4a, and 4b)
> Findings: The supporting documents to the binding site and conceptual site plan show interconnected landscaped open spaces along North Kelsey Street (Exhibits 2b and 4a)
> Findings: The supporting documents to the binding site and conceptual site plan show a pedestrian corner feature and focal open space along North Kelsey Street. A large landscaped open space buffers the proposed retail store on Lot 1 and aligns with the Village Green area across the textured and colored walkway. The sidewalk along North Kelsey Street connects the pedestrian corner features. Design review of the pedestrian corner feature will be under separate review (Exhibits 2b, 4a, and 4b)
> Findings: The stormwater detention facility at the intersection of North Kelsey Street and Chain Lake Road for the northern site is buffered and heavily landscaped (Exhibits 2b, 4a, and 4b)
> Conclusions: The proposed development of the northern site provides varied open spaces, attractive pedestrian-oriented spaces, and pedestrian amenities.

-31-

FONK first claims, "Development of the Wal-Mart site has not been organized around an interconnected set of heavily landscaped open spaces, nor does the site include an open space that fronts on North Kelsey Street or aligns with the Focal Plaza and Village Green." Appellant's Br. at 34. As discussed above, the city council's findings are verities on appeal except for the one FONK properly challenges here.

FONK properly challenges the finding that the supporting documents to the binding site and conceptual site plan show a focal open space along North Kelsey Street. However, substantial evidence, i.e., "evidence that would persuade a fair-minded person of the truth of the statement asserted," supports that finding. Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). Considering all of the evidence and reasonable inferences in the light most favorable to the respondents, as we must, the record shows an open landscaped space at the southern portion of Wal-Mart's proposed site along North Kelsey Street. See CP at 758, 777 (showing landscaped southern portion of property with lawn area and trees adjacent to North Kelsey Street). Given that the remaining findings are verities on appeal—and nevertheless supported by substantial record evidence showing the landscaping, interconnecting sidewalks, and central plaza area in front of the proposed store—FONK fails to meet its burden of showing clear error in the city council's decision. FONK's arguments amount to subjective disagreement with the city council's findings. As noted above, we do not weigh the evidence or substitute our judgment for the reviewing official's judgment. Phoenix Dev., 171 Wn.2d at 832.

## Parking Areas

With respect to parking areas, the intent is:

- To provide convenient parking areas that encourage people to leave their cars and walk throughout the North Kelsey Planning Area.
- To provide more flexibility in the design of the development by relaxing existing City parking standards.
- To provide parking areas that do not diminish pedestrian and visual qualities of the site.
- To maintain the built street edge through effective screening of all parking lots.
- To minimize the impact of driveways.

FONK claims that Wal-Mart failed to meet the following associated guidelines:

4. Pathways through parking lots should be provided. Pathways and crosswalks should be provided along every fourth aisle or at intervals of less than 150 feet. Pathways through parking areas should be separated from vehicle parking and travel lanes by use of contrasting surface materials . . ., which may be raised above the level of the vehicular surface. Parking area pathways should be at least 4 feet in width.

. . . .

S1. Pedestrian-scale lighting shall be used to define pedestrian walkways through parking areas. Weather protection features over such walkways are also highly desirable (U-Village example)—particularly when such walkway connects uses within the site.

FONK also points to figure 16 in the guidelines and claims Wal-Mart failed to meet the following side note included in that figure: "While parking areas should be accessible and convenient, their design and layout should minimize negative impacts on the pedestrian environment and visual quality of the development."

Specific to parking areas, the city council adopted the following staff report findings:

Findings: The proposed parking areas as shown in the binding site plan, supporting documents, and conceptual site plan conform to the requirements of Chapter 18.86 MMC (Exhibits 2a, 2b, 3, and 4a)
Findings: The supporting documents to the binding site plan (Exhibit 2b) indicate that the proponent will construct 687 parking spaces (659 are required for the

total retail area of 164,781 [square feet] including garden centers based on a ratio of 1 space per 250 square feet of gross floor area).
Findings: The proposed parking area includes one main driveway off North Kelsey Street that aligns with the entrance to the southern site and three driveways off Galaxy Way. The applicant proposes to include pathways through the main parking lot in three areas connecting to Galaxy Way to the main entrance and an additional pathway from North Kelsey Street to the main entrance. The perimeter of all parking areas are landscaped (Exhibits 2a, 2b, 3, and 4a)
Conclusions: The proposed development and preliminary design concept for the northern site are consistent with the plan's parking strategy for the Planned Development Area.

The city council also adopted the staff report's supplemental finding that Wal-Mart's parking proposal includes "pedestrian-scale lighting within the parking areas adjacent to defined pathways" and incorporates "parking lot landscaping, patterned concrete pathways through the parking areas, and patterned and colored concrete at crosswalks."

The city council also adopted the following staff report findings and conclusions specifically addressing sidewalks and pathways in the proposed development:

Findings: As previously noted, the binding site plan, supporting documents, and conceptual site plan show pedestrian connections between the proposed development along Galaxy Way to the west, North Kelsey Street to the south, and along the public sidewalk to the east up to Chain Lake Road. (Exhibits 2b and 4a)
Findings: Proposed sidewalks will be ADA compliant and include landscaped planting strips. (Exhibits 2b and 4a)
Findings: Proposed sidewalks along North Kelsey Street are eight feet in width and five feet in width along Galaxy Way. (Exhibits 2a and 2b)

. . . .

Findings: A secondary pathway, adjacent to the northern site's main entrance, from North Kelsey Street to the proposed retail store on Lot 1, will be five feet in width and include street trees. (Exhibits 2b and 4a)
Findings: Internally, the northern site includes pedestrian paths and walkways to and from the retail store, and throughout the main parking area. (Exhibits 2a, 2b, and 4a)

-34-

Conclusions:  The proposed development plans and preliminary design concept for the northern site meet the sidewalk and pathway requirements for the Planned Development Area.

FONK first contends that Wal-Mart's parking proposal "maximizes negative impacts on the pedestrian environment and the visual quality of the development," is "not a pedestrian-oriented plan," and "[p]art of the parking lot is in the location that was required by the Plan to be open space that is spatially unified and aligned with the south site Village Green and Focal Plaza." Appellant's Br. at 37-38.  FONK fails to support these subjective statements with any facts or analysis, and we can decline to address them.  See Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (declining to consider an inadequately briefed argument).  These statements are also insufficient to demonstrate that Wal-Mart's proposal violates any binding requirement.

FONK also argues that pathways and crosswalks are not provided along every fourth parking aisle or at intervals of less than 150 feet, pathways are not separated from parking and travel lanes by use of contrasting surface materials, and no evidence in the record shows the width of the pathways through the parking areas.  Contrary to FONK's assertion and consistent with the findings and conclusions quoted above, the record clearly shows that Wal-Mart's parking proposal includes pedestrian pathways meeting the "every fourth aisle" requirement.  The record also shows that the pedestrian pathways are separated from vehicle parking and travel lanes by both contrasting surface materials and landscaping.  Finally, the record demonstrates that all pathway widths will be between 5 and 12 feet wide, depending on location, and pedestrian lights

are marked along the pathways. FONK fails to demonstrate clear error in the city council's determination of compliance.

### Street Corners/Highly Visible Locations

With respect to street corners/highly visible locations, the development plan's intent is:

- To enhance the appearance of highly visible locations.
- To enhance the pedestrian environment.
- To establish a design identity for the North Kelsey Planning Area.

FONK claims Wal-Mart failed to meet the following specific guidelines:

The guidelines below highlight desirable design treatments (options noted below) for six specific street corners and/or highly visible locations as noted in the Site Development Concept. All proposals for sites should include at least one of the design treatments described below. EXCEPTION: Applicants may propose other design treatments for these sites if they can demonstrate successfully that the proposed treatment meets the intent of the guidelines.

1. Street Corner/Highly Visible Location Design Treatment Methods (also refer to Pedestrian Orientation guidelines, Chapter 3):
a. Locate a building towards the street corner (within 15 feet of corner property line). Building facades located here are encouraged to include a special element, such as a raised roofline, towers, or an extended parapet, along the most visible views of the structure.
b. Provide a pedestrian walkway and/or plaza space at the corner leading directly to a building entry or shopping plaza space. . . .
c. Install substantial landscaping (at least 200 square feet of ground surface area with trees, shrubs, and or ground cover. . . .)
2. Specific sites:
. . . .
e. North Kelsey Street (at key pedestrian crossing): Method "a" is preferred for all four corners.

Under this category, the city council adopted the following staff report findings and conclusions:

Findings: Chapter 3, Section E identifies six highly visible areas and encourages design treatments at these locations. Two highly visible areas abut the northern site: Location D and E.

Findings:  Lot 1 is adjacent to Location D.  Lot 1 includes a large landscaped area at Location D.

Findings:  Lots 1 and 3 are adjacent to Location E.  Lot 1 includes a landscaped area and pedestrian path at Location E.  Lot 3 will include a retail store or restaurant adjacent to Location E.  Design review for future development of Lot 3 will be under a separate permit.  (Exhibits 2a, 2b, 3, and 4a).

Conclusions:  The proposed development and preliminary design concept for the northern site include some desirable design elements encouraged for Highly Visible Locations within the Planned Development Area.

FONK contests only Wal-Mart's treatment of location E (the key pedestrian crossing from the south site to the north site across North Kelsey Street).  See CP at 2010, figure 19.  FONK contends, "Wal-Mart is not treating Location E as a highly visible location" and "none of the design treatments have been adopted by the Wal-Mart proposal for this Key Pedestrian Crossing."  Appellant's Br. at 41.  FONK argues that the Wal-Mart building fails to orient toward the key pedestrian crossing at location E and the landscaping is inconsistent with the intent of the guidelines because "it acts as a barrier to the pedestrian environment, not an enhancement" and "is meant to hide a parking lot that should not be there in the first place . . . ."  Appellant's Br. at 41.  However, FONK's essentially subjective, aesthetic complaints are insufficient to demonstrate clear error.  The guidelines provide that site proposals should include "at least one" of the design treatments listed above, and method "a" (locating a building near/within 15 feet of the street corner) is merely the preferred treatment for this location.  Other treatments include providing a pedestrian walkway at the corner leading directly to a building entry or installing substantial landscaping.  The record shows that Wal-Mart's proposal includes a pathway at location E leading to the store entrance, as well as substantial landscaping and a monument sign.  The record thus supports the city council's findings—and the findings support its conclusion—that Wal-Mart's

proposal includes elements encouraged for street corners/highly visible areas. FONK's

conclusory opinions regarding the appearance and function of the landscaping are

insufficient to show clear error.

### Architectural/Building Design

North Kelsey's architectural/building design guidelines are grouped into three

subcategories. FONK challenges two of these subcategories—architectural concept

and human/pedestrian scale.

### Architectural Concept

The first subcategory, "architectural concept," sets forth intent statements,

including:

- To create, through the architectural, landscape, open space, and gateway elements, an identity unique within the region and that reflects Monroe's small town character.
. . . .
- To create an assemblage of buildings within the planned development area with an intimately scaled (i.e., the buildings appear to be smaller in size, generally less than 150 feet in length along a façade, even though the building footprint may be larger) and informal architectural character.
- To create a varied, non-homogenous set of buildings within the planned development area that give the sense of natural evolution over time rather than a result of a single, one-step development -- and to emphasize the fact that the building elements can naturally evolve and change over time without disrupting a constricting design theme.

A supplemental intent statement is "[t]o encourage architecture that evokes a

'Northwest' architectural theme based upon its use of natural local materials and

northwest architectural heritage."

The associated guidelines for the architectural concept subcategory provide:

1. The buildings proposed for the North Kelsey planned development area should be based on a comprehensive architectural concept that achieves the

68463-9-I/39

intent statements above. Specifically, the design of the specific buildings should address:

- Pedestrian interest and comfort along the perimeter of open spaces and pedestrian connections.
- The size of building massing and elements relative a human body.
- The perceived massing of the building relative to nearby structures, open spaces, and landscape elements.
- Monroe's architectural and cultural setting.
- The variety of sequential experiences and design characters within the site.

While the individual design guidelines in this section address some of these issues specifically, the intent of this guideline is to encourage the designers to consider how the various aspects of the design work together. Applicants should be prepared to demonstrate how the proposed buildings respond to the intent statements. The City will review applicants' proposals and determine whether or not they meet the intent.

Supplemental guidelines provide, "[A]ll structures should employ exposed timber elements or a similar feature approved by the City as a unifying architectural feature," and that projects "should address all facades visible by the public . . . . Such facades should be treated in a manner that is consistent in form and character with the rest of the building."

Regarding architectural concept, FONK contends that Wal-Mart's proposal "does not address the size of the building massing elements relative to a human body to the degree required by [the Development] Plan" and "does not address the perceived massing of the building." Appellant's Br. at 44, 45. FONK cites to "Figure 6 at CP 327"—which shows a building oriented toward open space and smaller "out-buildings" on each side—for its argument that Wal-Mart's proposal is inconsistent with the guidelines. Appellant's Br. at 45.

Under this category, the city council found, "As previously noted, the conceptual site elevations for the northern site emphasize façade modulation, variation in materials,

-39-

and variation in color, among other desirable architectural design elements and treatments along the primary, secondary, side, and rear facades." Previous findings addressing the development concept's "pedestrian friendly" and "intimately scaled" goals also discuss façade modulation and variation in materials and color. Figure 6, Clerk's Papers at 327, is titled "Ways of reducing the scale of large buildings" and, thus, provides one possible way of placing buildings to meet the guidelines. This diagram provides no support for the argument that such placement is the only way to meet the guidelines. The record demonstrates that the Wal-Mart building will include significant articulation, roofline modulation, and façade variation, and it will incorporate numerous exterior treatments, design features, and landscaping. FONK cites to no authority for its argument that these features do not address "perceived massing" of the building. FONK also fails to support its argument that the plan requires more than what Wal-Mart proposed here. FONK fails to demonstrate clear error in the city council's application of these guidelines.

Human/Pedestrian Scale

The second subcategory, human/pedestrian scale, sets forth intent statements including:

- To create an assemblage of buildings with an intimately scaled appearance and informal architectural character.
- To architecturally treat large buildings to ensure that they do not dominate the area's identity.
- To provide interesting and sheltering pedestrian-oriented facades.

The associated guidelines address building height and vertical articulation. Relevant to this appeal, the guidelines state, "[B]uildings with visible facades over 100 feet in

-40-

length . . . should be vertically articulated into sections averaging not more than 50 feet along the façade at regular intervals."

Regarding human/pedestrian scale, FONK argues, "The Wal-Mart building is not vertically articulated into sections averaging not more than 50 feet along the façade at regular intervals" as required by the guidelines. Appellant's Br. at 46. The relevant guideline states that articulation may be accomplished in several ways, including modulation, building focal points, using significant building elements, changing the roofline, changing materials, landscaping, or "[u]sing other methods acceptable to the City." Under this category, the city council found, "The conceptual site elevations show vertical articulation along the primary, secondary, side, and rear facades including stepping back portions of the façade including distinctive features, and changing materials." Substantial evidence supports this finding—each type of articulation is shown in the building elevation drawings of the proposed Wal-Mart store.

FONK essentially argues that the city council failed to make a specific finding that the vertical articulation occurs in sections averaging not more than 50 feet. But in that case, we look for substantial evidence to support such a finding had the trial court made it. As discussed above, the record shows several methods of vertical articulation along each façade. While the building elevation diagrams in the record do not specify that each vertical articulation section averages not more than 50 feet wide, "we view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority"—in this case the City and Wal-Mart. Phoenix Dev., 171 Wn.2d at 828-29. Under the substantial evidence standard, there must be sufficient evidence to "persuade a reasonable person that the declared premise is true." Phoenix

-41-

Dev., 171 Wn.2d at 829. Reasonable inferences from the existing record show that Wal-Mart's proposal meets the average vertical articulation requirement.[16] We are not left with a definite and firm conviction that a mistake was committed. FONK thus fails to show clear error in the city council's approval of the proposed store on this basis.

Planned Action/SEPA

FONK contends the city council erred by determining that the Wal-Mart project was a planned action under SEPA. Respondents counter that FONK cannot show clear error in the city council's SEPA determination.

A planned action is an alternative SEPA mechanism, providing for streamlined environmental review of particular projects. See RCW 43.21C.031; WAC 197-11-164 to 172. "SEPA specifically provides that local governments planning under the [Growth Management Act] GMA may enact a planned action ordinance that allows subsequent projects within the parameters of the ordinance to avoid further environmental review." Davidson Serles & Assocs. v. City of Kirkland, 159 Wn. App. 616, 632, 246 P.3d 822 (2011). In Davidson Serles we discussed the purpose and procedure for this approach:

> A planned action ordinance enumerates particular "planned actions" that will be allowed to proceed without a threshold determination or an EIS [environmental impact statement]. SEPA authorizes such an approach because

---

[16] Given that the proposed Wal-Mart store's area is approximately 151,719 square feet and the store is roughly square-shaped, each side of the building is approximately 390 feet (the square root of 151,719). The building is not perfectly square (the front and back façades are longer than the side facades). But for purposes of calculating vertical articulation sections, the guideline is phrased in terms of averages and, thus, the exact length of each façade is immaterial. Dividing 390 feet by 50 feet results in an average of 8 vertical articulations per side (32 articulations total) to meet the guideline. Counting the number of vertical articulation methods shown in the "Option II" building elevations diagrams, as approved by the city council, leads to the conclusion that Wal-Mart meets the requirement.

the planned action ordinance simply implements the existing land use policies and development regulations of a city or county planning under the GMA. . . .

The planned action ordinance merely simplifies and expedites the land use permit process by relying on the local government's preexisting land use plan policies and development regulations. The potential environmental impacts of planned action projects authorized by the planned action ordinance have already been addressed in an EIS that was earlier prepared in conjunction with one of the six undertakings listed in RCW 43.21C.031(2)(a)(ii).

Davidson Serles, 159 Wn.2d at 635-36.

As discussed above, the City adopted a planned action ordinance in 2004 (Ordinance No. 003/2004) addressing future development of the North Kelsey area. The ordinance incorporated the City's FSEIS for the North Kelsey area, which identified and addressed the probable significant environmental impacts of future development on the site. The ordinance also set forth several requirements for planned action designations. The ordinance "limits the planned action to commercial, residential, and industrial development that is consistent with the [City of Monroe's] Comprehensive Plan, the North Kelsey Development Plan, the North Kelsey Design Guidelines, and North Kelsey Planned Action SEIS." The ordinance also provides that if a project does not meet these requirements, "the project is not a planned action and additional environmental review shall be required as provided in WAC 197-11-172."

WAC 197-11-172 codifies the standards and procedure for determining whether a specific land use proposal falls within the scope of a previously-adopted planned action ordinance. It provides in relevant part:

(1) Review of a project proposed as a planned action is intended to be simpler and more focused than for other projects. A project proposed as a planned action must qualify as the planned action designated in the planned action ordinance or resolution, and must meet the statutory criteria for a planned action in RCW 43.21C.031. Planned action project review shall include:

-43-

> (a) Verification that the project meets the description in, and will implement any applicable conditions or mitigation measures identified in, the designating ordinance or resolution; and
>
> (b) Verification that the probable significant adverse environmental impacts of the project have been adequately addressed in the EIS prepared under WAC 197-11-164 (1)(b) through review of an environmental checklist or other project review form as specified in WAC 197-11-315, filed with the project application.
>
> (2)(a) If the project meets the requirements of subsection (1) of this section, the project shall qualify as the planned action designated by the GMA county/city, and a project threshold determination or EIS is not required. Nothing in this section limits a GMA county/city from using this chapter or other applicable law to place conditions on the project in order to mitigate nonsignificant impacts through the normal local project review and permitting process.
>
> (b) If the project does not meet the requirements of subsection (1) of this section, the project is not a planned action and a threshold determination is required. . . . If an EIS or SEIS is prepared on the proposed project, its scope is limited to those probable significant adverse environmental impact that were not adequately addressed in the EIS used to designate the planned action.

WAC 197-11-172.

Determinations rendered by the City's SEPA-responsible official are entitled to substantial weight on appeal, and we review them under the "clearly erroneous" standard. RCW 43.21C.090; Clallam County Citizens for Safe Drinking Water v. City of Port Angeles, 137 Wn. App. 214, 224-25, 151 P.3d 1079 (2007); Thornton Creek Legal Defense Fund v. City of Seattle, 113 Wn. App. 34, 57-58, 52 P.3d 522 (2002). In challenging the City's planned action determination, FONK argues that Wal-Mart's proposal (1) "does not meet the description as set forth in the original North Kelsey Planned Action SEIS" and (2) "is inconsistent with the North Kelsey Development Plan and Design Guidelines" and, thus, was improperly characterized as a planned action for the North Kelsey area. Appellant's Br. at 50. Regarding the first argument, FONK fails to cite to any part of the FSEIS and provides no further argument regarding the project's

failure to meet the description set forth in that document. We decline to address that particular argument. See Norcon Builders, 161 Wn. App. at 486 (declining to consider an inadequately briefed argument).

FONK's second argument is based entirely on its claim that Wal-Mart's proposal is inconsistent with the plan and guidelines. As discussed above, most of FONK's claims regarding the project's consistency with the plan and guidelines fail. FONK's only remaining arguments on remand pertain to the pedestrian-oriented spaces guidelines addressing lighting height/adequacy and linear feet of public seating addressed above. We are confident this deficiency will be properly addressed and resolved on remand. SEPA requires the preparation of an EIS only for "proposals for legislation and other major actions having a probable significant, adverse environmental impact." RCW 43.21C.031(1) (emphasis added); see also WAC 197-11-172 ("If an EIS or SEIS is prepared on the proposed project [due to a project's failure to qualify as a planned action], its scope is limited to those probable significant adverse environmental impacts that were not adequately addressed in the EIS used to designate the planned action.") (emphasis added). FONK does not identify any specific environmental impacts of the project, does not claim that the City's SEPA-responsible official improperly ignored any such impacts, and does not challenge the city council's findings regarding compliance with environmental standards and mitigation measures. FONK's only surviving claims, relating to lighting and seating, address guidelines that essentially concern aesthetics and public enjoyment of the property. These surviving claims are unlikely to trigger further environmental review.

-45-

Attorney Fees

Wal-Mart and the City seek attorney fees on appeal as the prevailing parties under RCW 4.84.370. The prevailing or substantially prevailing party on appeal of a land use decision is entitled to its attorney fees if that party's decision also prevailed before the administrative agency and in the superior court. RCW 4.84.370(1)-(2); Friends of Cedar Park Neighborhood, 156 Wn. App. at 654-55. As the substantially prevailing parties on appeal, the City and Wal-Mart are entitled to an additional award of reasonable attorney fees on remand and on appeal subject to compliance with RAP 18.1.

## CONCLUSION

We remand for further proceedings consistent with this opinion and otherwise affirm the decision in all respects.

WE CONCUR:

_____

_____
Cox, J.

-46-